## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| CHARLES BLACKBURN, derivatively on behalf of DAVITA INC., | : |
| | : |
| Plaintiff, | : Civil Action No. _____ |
| | : |
| v. | : |
| | : |
| KENT J. THIRY, JAMES K. HILGER, PAMELA M. ARWAY, CHARLES G. BERG, CAROL ANTHONY DAVIDSON, BARBARA J. DESOER, PAUL J. DIAZ, PETER T. GRAUER, JOHN M. NEHRA, WILLIAM L. ROPER, ROGER J. VALINE, and PHYLLIS R. YALE, | : JURY TRIAL DEMANDED |
| Defendants, | : |
| and | : |
| DAVITA INC., | : |
| Nominal Defendant. | : |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     Plaintiff Charles Blackburn ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant DaVita Inc. ("DaVita" or the "Company")[1] against certain current and/or former members of its Board of Directors (the "Board") and executive officers, seeking to remedy Defendants' (defined herein) breaches of fiduciary duties, unjust enrichment and violations of Section 14(a) of the

---

[1] Effective September 1, 2016, DaVita HealthCare Partners Inc. changed its name to DaVita Inc.  The name change was effected through an amendment to the Company's certificate of incorporation pursuant to Section 242 of the Delaware General Corporation Law.

Securities Exchange Act of 1934, from at least 2015 through the present (the "Relevant Period").

## NATURE OF THE ACTION

2.    According to its public filings, DaVita provides kidney dialysis services for patients suffering from chronic kidney failure or end-stage renal disease ("ESRD"). The Company operates kidney dialysis centers and provides related lab services in outpatient dialysis centers, and provides acute inpatient dialysis services in approximately 900 hospitals and related laboratory services in the United States.

3.    This action involves an illegal and/or illicit scheme by Defendants to steer patients with government-subsidized health insurance into private health insurance plans to maximize Company profits.

4.    Because Medicaid and Medicare pay DaVita reimbursement rates of only $300 or less for one session of dialysis rendered to ESRD patients, Defendants caused the Company to begin to systematically target these patients and, through deception and unlawful/illicit means, convince them to drop or reject their affordable government insurance options and enroll in private, commercial insurance.  DaVita typically bills commercial insurers more than $4,000 for the same services being rendered to Medicaid and Medicare-eligible patients.  Therefore, DaVita's profitability is heavily dependent on revenues derived from private insurance companies.

5.    Although only 34% of DaVita's total dialysis services revenue in 2015 was generated from patients who had commercial health insurance, nearly all of the Company's profit derived from commercial payors.  Defendants were thus highly motivated to steer patients on Medicare and Medicaid into commercial insurance plans.

6.     In order to convince patients currently enrolled in Medicare and Medicaid to obtain private insurance, Defendants caused DaVita to inform patients that the American Kidney Fund ("AKF"), a third party charitable 501(c)(3) payor, would cover their monthly health insurance premiums in order for them to gain coverage that was typically out of reach financially.   DaVita and its competitors were only able to accomplish this feat by illegally and/or illicitly funneling money to the AKF, who would then utilize the proceeds to reimburse patients' health care premiums.  Notably, the AKF only funds insurance for dialysis (from which DaVita would benefit) and not insurance for alternative treatments for patients with ESRD, such as kidney transplants (from which DaVita would not benefit).

7.     On July 1, 2016, UnitedHealth Group, Inc. ("UnitedHealth") sued one of DaVita's competitors, kidney-care chain American Renal Associates Holdings, Inc. ("American Renal"), accusing American Renal of fraud.   UnitedHealth asserted that American Renal had engaged in a fraudulent and illegal scheme, in violation of various state anti-kickback and insurance fraud statutes, by convincing Medicare and Medicaid-eligible patients to enroll in UnitedHealth plans by referring them to the AKF.  According to UnitedHealth's complaint, American Renal was incentivized by UnitedHealth's out-of-network reimbursement rate for dialysis services, which dwarfed the rates paid by Medicare and Medicare.

8.     DaVita's illegal and/or illicit activity (occurring under Defendants' direction and on their watch) began to collapse shortly thereafter, as it became apparent that Defendants were causing DaVita to engage in the same illegal/illicit practices as American Renal through its relationship with the AKF.

9.     On August 18, 2016, The Centers for Medicare & Medicaid Services ("CMS") issued a public request for information regarding alleged steering of Medicare and Medicaid beneficiaries into other plans in order to earn higher reimbursement rates. As part of this request, CMS sent letters to all Medicare-enrolled dialysis centers (including DaVita) informing them of its announcement.   The CMS request for information and letters was aimed at situations where Medicare and/or Medicaid patients were steered into Affordable Care Act-compliant plans which could have resulted in the disruption of care associated with a change in network providers.

10.     In addition to the requested information, CMS asserted it was weighing imposing financial penalties on dialysis providers that were found to have steered individuals eligible for Medicare into Affordable Care Act ("ACA") plans.   CMS also indicated that it was considering banning or limiting premium payments for ACA plans by health care providers and changes to Medicare and Medicaid's provider enrollment rules.   In reaction to the disclosure about the CMS inquiry into the industry and the potential rule changes, DaVita's stock price dropped $3.17 per share, or 4.69%, from $67.65 per share on August 18, 2016 to $64.48 per share on August 19, 2016, wiping out approximately $625 million of the Company's market capitalization in a single day.

11.     On Sunday, October 23, 2016, the *St. Louis Post* published an article entitled "DaVita encouraged some low-income patients to enroll in commercial plans" that accused DaVita directly of steering clients to private insurers and utilizing its own money to pay for health insurance premiums through the AKF.   The article stated that internal e-mails from DaVita showed that the Company targeted patients in a campaign to get them to purchase insurance they did not necessarily need, saying that their monthly

premiums would be paid by a nonprofit foundation (the AKF).

12.     The *St. Louis Post* article called the Company's efforts "coordinated" and noted that DaVita was financially incentivized to steer patients away from social health care programs and into private insurers.

13.     In reaction to the disclosures in the *St. Louis Post* article, DaVita's stock price dropped $2.86 per share, or another 4.69%, from $60.96 per share on Friday, October 21, 2016 to $58.10 per share on Monday, October 24, 2016, wiping out an additional $565 million in Company market capitalization.

14.     Tellingly, merely one week later, on October 31, 2016, Defendants caused DaVita to issue a press release announcing that it was suspending support for applications to the AKF for charitable premium assistance by patients enrolled in minimum essential Medicaid coverage effective immediately.

15.     Defendants estimated that a policy change that prevented patients with minimum essential Medicaid coverage from accessing charitable premium assistance would result in a reduction to DaVita's annualized operating income of up to approximately $140 million before any offsets – close to 12% of DaVita's 2015 operating income.

16.     Then, on January 6, 2017, *The Wall Street Journal* reported that investigators from the U.S. Department of Justice (the "DOJ") "are probing a controversial arrangement under which kidney-care companies support charitable efforts to help patients pay health-insurance premiums, according to disclosures from major dialysis providers."   As part of the investigation, the U.S. Attorney's Office for the District of Massachusetts had subpoenaed DaVita and the AKF seeking information

relating to its charitable premium assistance.

17.     During the Relevant Period, Defendants made and/or caused the Company to make false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made and/or caused the Company to make false and/or misleading statements and/or failed to disclose that: (1) Defendants caused the Company to purposefully steer patients into unnecessary insurance plans in order to maximize profits; (2) Defendants caused the Company to use AKF as a vehicle to facilitate these improper practices; (3) as a result, DaVita's revenues and profits were illegally and/or illicitly obtained; (4) in turn, DaVita (under Defendants' direction and on their watch) lacked effective internal controls over financial reporting; and (5) as a result of the foregoing, Defendants' statements about DaVita's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

18.     As a result of Defendant's actions, the Company has suffered damages. These damages include (but are not limited to) financial harm, a decline in the Company's share price, damages associated with the investigations by the DOJ and the U.S. Attorney's Office for the District of Massachusetts, and severe loss of reputation and standing.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would

not otherwise have.

20.    Venue is proper in this district because the Company is incorporated in this District.

## THE PARTIES

21.    Plaintiff is a current shareholder of DaVita and has continuously held DaVita stock since December 2013.

22.    Nominal defendant DaVita is a Delaware corporation with its principal executive offices located at 2000 16th Street, Denver, CO 80202.

23.    Defendant Kent J. Thiry ("Thiry") has served as the Company's Chief Executive Officer ("CEO") since October 1999 and as Chairman of the Board since June 2015.  Previously, Thiry served as Chairman of the Board from October 1999 until November 2012.

24.    Defendant James K. Hilger ("Hilger") has served as the Company's Interim Chief Financial Officer ("CFO") since March 2015 and as Chief Accounting Officer ("CAO") since April 2010.  Previously, Hilger served as CFO from April 2012 until November 2013.

25.    Defendant Pamela M. Arway ("Arway") has served as a director of the Company since May 2009.  In addition, Arway served as a member of the Board's Public Policy Committee (the "Public Policy Committee") during the Relevant Period.

26.    Defendant Charles G. Berg ("Berg") has served as a director of the Company since March 2007.  In addition, defendant Berg served as a member of the Board's Audit Committee (the "Audit Committee") and as Chair of the Board's Compliance Committee (the "Compliance Committee") during the Relevant Period.

27.     Defendant Carol Anthony "John" Davidson ("Davidson") has served as a director of the Company since December 2010.  In addition, Davidson served as Chair of the Audit Committee during the Relevant Period.

28.     Defendant Barbara J. Desoer ("Desoer") has served as a director of the Company since October 2015.  In addition, Desoer served as a member of the Compliance Committee during the Relevant Period.

29.     Defendant Paul J. Diaz ("Diaz") has served as a director of the Company since July 2007.  In addition, Diaz served as a member of the Compliance Committee and Public Policy Committee during the Relevant Period.

30.     Defendant Peter T. Grauer ("Grauer") has served as a director of the Company since August 1994 and as lead independent director since 2003.

31.     Defendant John M. Nehra ("Nehra") has served as a director of the Company since November 2000.  In addition, Nehra served as Chair of the Public Policy Committee during the Relevant Period.

32.     Defendant William L. Roper ("Roper") has served as a director of the Company since May 2001.   In addition, Roper as a member of the Compliance Committee during the Relevant Period.

33.     Defendant Roger J. Valine ("Valine") has served as a director of the Company since June 2006.   In addition, Valine served as a member of the Audit Committee during the Relevant Period.

34.     Defendant Phyllis R. Yale ("Yale") has served as a director of the Company since July 2016.

35.     Collectively, defendants Thiry, Hilger, Arway, Berg, Davidson, Desoer,

Diaz, Grauer, Nehra, Roper, Valine, and Yale shall be referred to herein as "Defendants."

36.     Collectively, defendants Berg, Davidson and Valine shall be referred to as the "Audit Committee Defendants."

37.     Collectively, defendants Berg, Desoer, Diaz and Roper shall be referred to as the "Compliance Committee Defendants."

38.     Collectively, defendants Arway, Diaz and Nehra shall be referred to as the "Public Policy Committee Defendants."

**DEFENDANTS' DUTIES**

39.     By reason of their positions as officers, directors, and/or fiduciaries of DaVita and because of their ability to control the business and corporate affairs of DaVita and its subsidiaries, Defendants owed DaVita and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage DaVita and its subsidiaries in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of DaVita and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to DaVita and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and its subsidiaries and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     Defendants, because of their positions of control and authority as directors and/or officers of DaVita, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive,

managerial, and directorial positions with DaVita, each of the Defendants had knowledge of material non-public information regarding the Company.

41.     To discharge their duties, the officers and directors of DaVita were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of DaVita were required to, among other things:

  a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

  b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

  c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

42.     The Company's Code of Conduct (the "Code") applies to each of the Defendants.  The Code sets forth, in relevant part:

**Our Responsibilities**

Compliance is everyone's responsibility:

• DaVita is committed to full compliance with federal healthcare program requirements.
• Read, understand and follow the Code and the Compliance Program.
• Seek guidance when in doubt.

• Avoid illegal, unethical or otherwise improper acts.
• Report any suspected violation of DaVita policies and procedures, laws or regulations applicable to DaVita's business or this Code.
• Assist authorized teammates with compliance inquiries, audits, investigations and other activities.
• Take responsibility and accountability for your actions.
• Notify Team Quest immediately if the government sanctions or excludes you from participation in any government funded program.

\*       \*       \*

**OBLIGATION TO REPORT**

It is your duty to maintain the highest level of integrity and accountability by alerting a supervisor, senior management, Team Quest, JLD or the Compliance Hotline of suspected or actual violation of DaVita's policies and procedures, applicable laws and regulations, or this Code. We cannot exempt ourselves from the consequences of our own misconduct by reporting an issue, but self-reporting may be taken into account when determining appropriate corrective action.

If you fail to report a violation of DaVita policies and procedures, applicable laws or regulations, or  this Code, you may be subject to corrective action, up to and including termination of employment, to the extent permitted by law. Remaining silent about a violation of DaVita policies and procedures, applicable laws or regulations, or this Code puts you and DaVita in jeopardy.

\*       \*       \*

**RESPONDING TO EXTERNAL INVESTIGATIONS**

We are committed to appropriately responding to, and not interfering with, any lawful government inquiry, audit or investigation. We will be forthright in our dealings with government officials or employees who are responsible for administering and enforcing the law.

\*       \*       \*

**QUALITY PATIENT CARE**

We make a difference in each patient's life by providing quality care. We treat all patients with warmth, respect and dignity, providing care that is both medically necessary and appropriate. We involve patients in treatment planning and decisions affecting their care whenever appropriate.

*      *      *

## BUSINESS RELATIONSHIPS

We always treat our business partners, vendors, and third parties with integrity. Business is conducted in a fair manner consistent with DaVita policies and procedures, applicable laws and regulations, and this Code.

We select business partners, vendors and third parties based on objective criteria including quality, price and service. We make partnering decisions based on the supplier's ability to meet our needs. Based on local laws and proposed business activities, DaVita may screen or conduct appropriate due diligence on its business partners, vendors and third parties, including to determine if they have been sanctioned by any government entity or are excluded from participation in government programs.

*      *      *

## PROPER CODING, BILLING AND PATIENT ACCOUNTING

DaVita documents patient care completely and in a timely manner. The medical record is written evidence of the quality care we deliver to our patients. We educate our teammates and work diligently to prevent knowingly creating records that contain any false or misleading information.

We submit claims for payment or approval that are accurate, truthful, and contain properly documented codes. We only bill for goods or services that we provide. DaVita has implemented a process designed to identify mistakes in claims or reimbursements and timely make refunds where applicable.

*      *      *

## ACCURATE FINANCIAL RECORDS

We create and maintain accurate financial records. We never falsify or improperly alter information in any records, reports or other documents. All financial information must reflect actual transactions and conform to industry standards. These records serve as a basis for managing our business and are important in meeting our obligations to patients, teammates, business partners, vendors and third parties. We maintain a system of internal controls to provide reasonable assurances that all transactions are executed and recorded in a proper manner.

12

\*     \*     \*

## ANTITRUST LAWS

We conduct ourselves ethically, honestly and with integrity and comply with antitrust laws in our dealings with competitors and customers. Antitrust laws and other laws governing competition are designed to promote and protect free, lawful and fair competition in the marketplace; they vary from country to country but exist virtually in all countries. These laws apply to conduct at all levels of an organization. In general terms, antitrust and other laws governing competition require DaVita to compete on an individual basis rather than join with other companies or competitors in agreements to restrict competition or create monopolies.

Generally, antitrust laws prohibit:

• Abuse of market power to engage in unfair price discrimination and other forms of unfair methods of competition
• Agreements or actions with competitors that restrain trade in some way or are inconsistent with concepts of free, open and fair competition
• Abuse or exchange of intellectual property or confidential or proprietary business information with competitors
• Transactions that may lessen competition or tend to create a monopoly, a dominant position in the market, or market power

It is against the law and Company policy to agree with competitors on prices or supply levels, division of customers or sales territories, or bids. Teammates should pay particular attention to meetings with competitors, association meetings and trade shows to avoid the appearance of any anti-competitive behavior. If you find yourself in a questionable discussion, voice your concern, end the discussion, leave the meeting, and promptly inform the JLD.

Failure to comply with the antitrust laws could lead to criminal and civil penalties for DaVita and for Teammates personally, significant business disruptions, and harm to DaVita's reputation.

We are committed to achieving success by fair, lawful and vigorous competition. Teammates should discuss any concerns regarding a particular action or arrangement and the applicability of the antitrust laws with JLD.

## ANTI-CORRUPTION AND ANTI-BRIBERY LAWS

When we conduct business internationally, we comply with the U.S. Foreign Corrupt Practices Act (FCPA), as well as other anti-corruption

13

and anti-bribery laws. We have a zero tolerance for violations of these laws. The FCPA consists of two basic principles:

(1) Prohibition of bribes to non-U.S. government officials and employees; and
(2) Maintenance of accurate books, records and accounting systems and proper internal accounting controls.

In addition, in certain jurisdictions, local laws prohibit bribing individuals associated with nongovernment entities in exchange for business favors or other advantages. This is known as "private" or "commercial" bribery.

We will not directly or indirectly give, offer, or promise anything of value to any government official or employee, referral source, or other person or entity whether affiliated with a government or private entity, with the corrupt intent to obtain or retain business, or secure an unfair business advantage. Nor will we use third parties to perform activities that would be in violations of DaVita's policies and procedures, applicable laws and regulations, or this Code.

Our business partners, vendors and third parties are also prohibited from giving, offering, or  promising anything of value to any individual in violation of the FCPA or other anti-corruption and anti-bribery laws. All payments made on behalf of DaVita must include accurate, truthful and complete written documentation regarding the payment and the purpose of the payment.

Conversely, we will not solicit or accept anything of value from any person or entity seeking, entering into, or conducting a business transaction with DaVita that may compromise or appear to compromise our business decisions.

**ANTI-KICKBACK LAWS**

We conduct business dealings with referral sources (e.g., physicians and other healthcare providers) in accordance with local laws and regulations. In the U.S., this means business dealings with referral sources are at fair market value and negotiated at arm's length. DaVita's policy prohibits improperly accepting, soliciting or providing kickbacks of any kind. A kickback is an improper payment, gift, service, or item of value offered or received in return for increased business or patient referrals. We are all responsible for complying with DaVita's Anti-kickback policies and all Anti-kickback laws that apply to our business.

**MARKETING AND ADVERTISING PRACTICES**

We practice honest, straightforward and non-deceptive marketing techniques. Consistent with laws and regulations, we may use marketing and advertising activities to educate the public, increase awareness of our services and recruit teammates.

\*         \*         \*

**CHARITABLE CONTRIBUTIONS**

Charitable contributions may be made to outside charities, on DaVita's behalf, with proper approvals from D-COMM in the U.S. or Team Quest outside the U.S. We do not participate in charitable activities or make charitable contributions to improperly induce referrals, to illegally gain an unfair business advantage, or in violation of the law.

Because we are a Village, we help each other and our greater community. We are encouraged to volunteer for charitable activities. However, no person may pressure another to do so. We may also participate in non-DaVita-sponsored charitable activities as long as it does not affect our work.

43.     Pursuant to the terms of the Audit Committee Charter, the Audit Committee Defendants were responsible for, *inter alia*, assisting the Board with oversight of the integrity of DaVita's financial statements including the financial reporting and disclosure processes and the integrity and effectiveness of the Company's system of internal control over financial reporting; together with the Compliance Committee, assisting the Board with oversight of compliance with legal and regulatory requirements, including those that may have a material impact on the Company's financial statements; and monitoring the Company's disclosure controls and procedures and compliance with ethical standards.

44.     Pursuant to the terms of the Compliance Committee Charter, the Compliance Committee Defendants were responsible for, *inter alia*, overseeing and monitoring the effectiveness of the Company's healthcare regulatory compliance program, reviewing significant healthcare regulatory compliance risk areas, and

15

reviewing the steps management is taking to monitor, control and report these risk exposures together with the Audit Committee, assisting the Board with oversight of compliance with healthcare regulatory requirements; and primary responsibility for oversight of healthcare regulatory requirements and for directing the Company's response to certain pending governmental investigations.

45.     Pursuant to the terms of the Public Policy Committee Charter, the Public Policy Committee Defendants were responsible for, *inter alia*, advising the Board on public policy and making recommendations to the Board as to policies and procedures relating to issues of public policy and government relations; and overseeing the Company's government affairs activity and political spending.

## SUBSTANTIVE ALLEGATIONS

### A.      <u>Background of the Company and its Business</u>

46.     DaVita provides kidney dialysis services for patients suffering from chronic kidney failure or end-stage renal disease.  The Company operates kidney dialysis centers and provides related lab services in outpatient dialysis centers, and provides acute inpatient dialysis services in approximately 900 hospitals and related laboratory services in the United States.  As of September 30, 2016, DaVita provided dialysis services to a total of approximately 199,000 patients at 2,457 outpatient dialysis centers, of which 2,318 centers were located in the United States and 139 centers were located in 11 countries outside of the United States.

47.     DaVita operates through two divisions: Kidney Care and HealthCare Partners.  Kidney Care provides dialysis services to patients with chronic kidney failure or ESRD.  HealthCare Partners manages and operates medical groups and affiliated

physician networks in California, Nevada, New Mexico, Florida, Colorado and Washington.

48.     Defendants unlawfully and/or illicitly targeted patients whose dialysis treatments were currently covered under Medicare and Medicaid in an effort to get them to purchase private insurance by promising that their monthly insurance premiums would be paid by a nonprofit foundation.  Private insurers pay DaVita as much as $4,000 per dialysis session, whereas government plans such as Medicaid and Medicare pay $300 or less per dialysis session.  By funding a nonprofit foundation to help individuals obtain private health insurance, DaVita was able to steer patients to commercial plans, such as the individual coverage under the ACA.

**B.       Defendants' Relevant Period False and Misleading Statements**

49.     During the Relevant Period, the Company's press releases, investor presentations and public filings made with the United States Securities and Exchange Commission (the "SEC") (all issued under Defendants' direction and on their watch) included material misstatements and/or omissions concerning the Company's financial results, which included revenue derived from insurance plans in which an industry-funded non-profit entity was improperly paying for patients' health care premiums. These false and misleading statements created a false impression of DaVita's business and operational status and future growth prospects, as Defendants were causing the Company to rely on unethical, illicit and/or illegal business practices to boost profitability.

50.     On August 4, 2015, after the market closed, Defendants caused DaVita to issue a press release announcing its financial results for the second quarter ended June 30,

2015.  For the quarter, Defendants caused DaVita to report adjusted net income of $207 million, or $0.95 per share, and consolidated net revenues of $3.44 billion.  The press release, in relevant part, stated:

> DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter ended June 30, 2015. Adjusted net income attributable to DaVita HealthCare Partners Inc. for the three months ended June 30, 2015 was $207 million, or $0.95 per share, excluding after-tax debt redemption charges of approximately $29 million, or $0.13 per share, and a tax adjustment related to the settlement of the Vainer private civil suit (the Vainer suit) of approximately $8 million, or $0.04 per share. Net income attributable to DaVita HealthCare Partners Inc. for the three months ended June 30, 2015 including these items was $170 million, or $0.78 per share.

> *        *        *

> **Outlook**
> - We are updating the low end of our consolidated operating income for 2015 to now be in the range of $1.825 billion to $1.925 billion. Our previous consolidated operating income guidance for 2015 was in the range of $1.800 billion to $1.925 billion.
> - We are also updating the low end of our operating income for Kidney Care for 2015 to now be in the range of $1.600 billion to $1.650 billion.
>   Our previous operating income guidance for Kidney Care for 2015 was in the range of $1.575 billion to $1.650 billion.
> - We still expect our operating income for HCP for 2015 to be in the range of $225 million to $275 million.
> - We are updating our consolidated operating cash flow for 2015 to now be in the range of $1.600 billion to $1.750 billion. Our previous consolidated operating cash flow for 2015 was in the range of $1.500 billion to $1.700 billion.

51.    In addition, the Q2 2015 Form 10-Q (and each of DaVita's subsequent quarterly and annual reports filed with the SEC described herein) contained certifications signed by defendants Thiry and Hilger pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), attesting that the financial information contained in the filing was true, did not omit material facts, and that the Company's internal and disclosure controls were effective.

52.     Defendants Thiry and Hilger certified in the Q2 2015 Form 10-Q (and each of DaVita's subsequent quarterly and annual reports filed with the SEC described herein) that:

> [T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

53.     With respect to DaVita's reported financial information, defendants Thiry and Hilger certified in the Q2 2015 Form 10-Q that:

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

54.     With respect to DaVita's internal controls, defendants Thiry and Hilger certified in the Q2 2015 Form 10-Q (and each of DaVita's subsequent quarterly and annual reports filed with the SEC described herein) that they personally: (i) were responsible for establishing and maintaining disclosure controls and procedures; (ii) designed or caused DaVita's controls or procedures to be designed to ensure that material information relating to DaVita and its consolidated subsidiaries was made known to them by others within those entities; (iii) designed or caused DaVita's controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (iv) evaluated the effectiveness of the DaVita's disclosure controls and procedures, and (v) presented in DaVita's quarterly and annual filings their conclusions about the effectiveness of the disclosure controls and procedures.

55.     On November 3, 2015, Defendants caused DaVita to issue a press release

announcing its financial results for the third quarter ended September 30, 2015.  For the

quarter, Defendants caused DaVita to report net income of $216 million, or $1.00 per

share, and consolidated net revenue of $3.53 billion.  The press release, in relevant part,

stated:

> DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results
> for the quarter ended September 30, 2015. Net income attributable to
> DaVita HealthCare Partners Inc. for the three months ended September 30,
> 2015 was $216 million, or $1.00 per share.
>
> Adjusted net income attributable to DaVita HealthCare Partners Inc. for
> the nine months ended September 30, 2015 was $610 million, or $2.80 per
> share, excluding after-tax debt redemption charges, after-tax settlement
> charge related to the Vainer suit and a related tax adjustment. Net income
> attributable to DaVita HealthCare Partners Inc. for the nine months ended
> September 30, 2015 including these items was $276 million, or $1.27 per
> share.
>
> *       *       *
>
> **Outlook**
> - We are updating our consolidated operating income for 2015 to
>   now be in the range of $1.870 billion to $1.915 billion.
>   Our previous consolidated operating income guidance for 2015
>   was in the range of $1.825 billion to $1.925 billion.
> - We are also updating our operating income for Kidney Care for
>   2015 to now be in the range of $1.630 billion to $1.655 billion.
>   Our previous operating income guidance for Kidney Care for 2015
>   was in the range of $1.600 billion to $1.650 billion.
> - We are updating our operating income for HCP for 2015 to now be
>   in the range of $240 million to $260 million.
>   Our previous operating income guidance for HCP for 2015 was in
>   the range of $225 million to $275 million.
> - We are updating our consolidated operating cash flows for 2015 to
>   now be in the range of $1.675 billion to $1.775 billion.
>   Our previous consolidated operating cash flow for 2015 was in the
>   range of $1.600 billion to $1.750 billion.

56.     The Q3 2015 Form 10-Q represented that those financial results were

accurate and presented in accordance with GAAP and that the Company's internal

controls were effective and disclosed any material changes to the Company's internal

controls over financial reporting.

57.     The Q3 2015 Form 10-Q included SOX Certifications signed by defendants Thiry and Hilger which were substantially similar to those set forth above.

58.     On February 11, 2016, Defendants caused DaVita to issue a press release announcing its financial results for the fourth quarter and full year 2015.   The press release set forth, in relevant part:

> DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter and year ended December 31, 2015. Adjusted net income attributable to DaVita HealthCare Partners Inc. for the quarter ended December 31, 2015 was $214 million, or $1.01 per share, excluding estimated non-cash goodwill and other intangible asset impairment charges, as discussed below, and an estimated accrual for damages and liabilities associated with our pharmacy business, all after-tax. Net loss attributable to DaVita HealthCare Partners Inc. for the quarter ended December 31, 2015 including these items was $(6) million, or $(0.03) per share.
>
> Adjusted net income attributable to DaVita HealthCare Partners Inc. for the year ended December 31, 2015 was $828 million, or $3.83 per share, excluding estimated non-cash goodwill and other intangible asset impairment charges, an estimated accrual for damages and liabilities associated with our pharmacy business, debt redemption charges and a settlement charge related to the Vainer private civil suit, all after-tax. Net income attributable to DaVita HealthCare Partners Inc. for the year ended December 31, 2015 including these items was $270 million, or $1.25 per share.
>
> *       *       *
>
> **Outlook**
> - We expect our consolidated operating income for 2016 to be in the range of $1.800 billion to $1.950 billion.
> - We expect our operating income for Kidney Care for 2016 to be in the range of $1.625 billion to $1.725 billion.
> - We expect our operating income for HCP for 2016 to be in the range of $175 million to $225 million.
> - We expect our consolidated operating cash flows for 2016 to be in the range of $1.550 billion to $1.750 billion.

59.     With regard to the AKF, DaVita's 2015 Form 10-K indicated that "[s]ome

patients who do not qualify for Medicaid, but otherwise cannot afford secondary insurance, can apply for premium payment assistance from charitable organizations through a program offered by the American Kidney Fund.  We and other dialysis providers support the American Kidney Fund and similar programs through voluntary contributions."

60.     The statements referenced above were materially false and/or misleading because they misrepresented the full extent of DaVita's relationship with the AKF and failed to disclose that the Company's substantial contributions to the AKF (under Defendants' direction and on their watch) were intended for the sole purpose of steering patients away from Medicare and Medicaid and into commercial insurers.

61.     With regard to the Company's financial performance, Defendants caused DaVita's 2015 Form 10-K filed with the SEC on February 26, 2016 (the "2015 10-K") to state:

> Our overall financial performance was once again strong for 2015, excluding certain non-GAAP items, and was characterized by solid treatment volume growth, primarily from non-acquired growth at existing and new dialysis centers, cost control initiatives, and productivity and payor mix improvements in our dialysis business, and solid growth in HCP's adjusted operating income.

62.     The statements above were materially false and/or misleading because DaVita's strong financial performance in 2015 was driven, in large part, by Defendants' illicit and/or illegal efforts to steer patients on Medicare and Medicaid into commercial insurers for the sole purpose of increasing the Company's profits.

63.     The 2015 10-K, signed by defendants Thiry, Hilger, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper and Valine, represented that those financial results were accurate and presented in accordance with GAAP and that the

Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The 2015 Form 10-K contained SOX Certifications by Thiry and Hilger which were substantially similar to those set forth above.

64.    On February 11, 2016, Defendants caused DaVita to hold a conference call with analysts and investors to discuss the Company's Q4 2015 results.  During the conference call, defendant Thiry emphasized that full year 2016 guidance was hampered by the "unfortunate fact" that Medicare reimbursements would remain flat for the third straight year.  To that effect, defendant Thiry emphasized:

> We anticipate in 2016 another solid year, $1.625 billion to $1.725 billion. Of course, there's always risk, we'll fall short and there's always hope that we will exceed. This guidance, per our normal customs, does include the international economics, and it also includes the unfortunate fact of flat Medicare reimbursement for the third straight year.

> The uncertainty in our 2016 performance, as in many recent years, centers on revenue and revenue per treatment. We anticipate our performance in the first half of the year with respect to [revenue per treatment] to be positive, but we have a lot less visibility into the second half of the year, hence the broadness of the range.

65.    Also during the call, Kevin K. Ellich from Piper Jaffray & Co. asked defendant Thiry what it would "take to get growth reaccelerating" after years of inconsequential growth.  Defendant Thiry responded: "A very fair question, Kevin, and one that we are pretty intense about on the inside.  On the Kidney Care front, with that flat Medicare reimbursement that's just a real problem that we've got to get addressed."

66.    On May 4, 2016, Defendants caused DaVita to issue a press release announcing its financial results for the first quarter ended March 31, 2016.  For the quarter, Defendants caused DaVita to report net income of $190 million, or $0.92 per

share, and consolidated net revenue of $3.58 billion.  The press release, in relevant part, stated:

> DaVita HealthCare Partners Inc. (NYSE: DVA) today announced results for the quarter ended March 31, 2016. Adjusted net income attributable to DaVita HealthCare Partners Inc. for the quarter ended March 31, 2016 was $190 million, or $0.92 per share, excluding a goodwill impairment charge, as discussed below, and an estimated accrual for damages and liabilities associated with our HCP Nevada hospice business, all net of tax. Net income attributable to DaVita HealthCare Partners Inc. for the quarter ended March 31, 2016 including these items was $97 million, or $0.47 per share.
>
> \*      \*      \*
>
> **Outlook**
> - We still expect our consolidated operating income for 2016 to be in the range of $1.800 billion to $1.950 billion.
> - We still expect our operating income for Kidney Care for 2016 to be in the range of $1.625 billion to $1.725 billion.
> - We still expect our operating income for HCP for 2016 to be in the range of $175 million to $225 million.
> - We still expect our consolidated operating cash flow for 2016 to be in the range of $1.550 billion to $1.750 billion.

67.     The Q1 2016 Form 10-Q represented that those financial results were accurate and presented in accordance with GAAP and that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q1 2016 Form 10-Q included SOX Certifications by defendants Thiry and Hilger, which were substantially similar to those set forth above.

68.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business and operations (occurring under Defendants' direction and on their watch).  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants caused the Company to purposefully steer patients into

unnecessary insurance plans in order to maximize profits; (2) Defendants were causing

the Company to use AKF as a vehicle to facilitate these improper practices; (3) as a

result, DaVita's revenues and profits were illegally and/or illicitly obtained; (4) in turn,

DaVita lacked effective internal controls over financial reporting; and (5) as a result of

the foregoing, Defendants' statements about DaVita's business, operations, and prospects

were false and misleading and/or lacked a reasonable basis.

69.     On May 10, 2016, Defendants caused the Company to file with the SEC

and disseminate to shareholders a Proxy Statement on Form DEF 14A (the "2016

Proxy").   Among other things, the 2016 Proxy contained a vote on the election of

directors, and an advisory vote on executive compensation for certain of the Company's

officers.   Further, the 2016 Proxy explicitly referenced the Code.   Defendants drafted,

approved, reviewed and/or signed the 2016 Proxy before it was filed with the SEC and

disseminated to DaVita shareholders.   Defendants knew, or were deliberately reckless in

not knowing, that the 2016 Proxy was materially false and misleading.

70.     With respect to executive compensation, the 2016 Proxy set forth, in

relevant part:

> As disclosed in the Compensation Discussion and Analysis, ***the Company
> believes that its executive compensation program is reasonable,
> competitive and strongly focused on pay-for-performance principles.*** We
> design our executive officer compensation program to attract and retain
> outstanding leaders who possess the skills and talent necessary to achieve
> our business goals and objectives. Our ultimate objective is to continue to
> create long-term stockholder value by being a leader in clinical outcomes,
> generating strong overall revenue growth, market share increases,
> operating margin growth, increases in Medicare Advantage enrollment
> and consistently strong total stockholder return ("TSR").
>
> In order to achieve this objective, we have established an executive
> compensation program that we believe:
> • rewards superior clinical outcomes;

> • *rewards strong Company performance;*
> • aligns our executives' interests with our stockholders' interests; and
> • is competitive within the health care services, diagnostics, managed care and solutions markets, so that we can attract and retain outstanding executives.
>
> We believe that the compensation of our named executive officers during fiscal 2015 is consistent with the following achievements and financial performance for 2015:
> • improved clinical outcomes in our U.S. dialysis operations, including second year in a row as leader of the Five-Star Quality Rating System created by the Centers for Medicare and Medicaid Services;
> • *consolidated net revenue growth of 7.7%;*
> • *net revenue growth of 5.2% related to our U.S. dialysis segment operations as a result of an increase in revenue per treatment of $6*;
> • an increase in HCP's net revenue of 9.6% related to an increase of its fee-for-service business and senior capitated revenue;
> • an increase in other ancillary services and strategic initiatives net revenue of 21.3%;
> • U.S. dialysis treatment growth of 4.1%;
> • normalized non-acquired U.S. dialysis treatment growth of 3.9%;
> • net addition of 72 U.S. dialysis centers and 27 international dialysis centers;
> • strong operating cash flows of $1.557 billion, which have been reduced by approximately $304 million of after-tax payments made in connection with the settlement of the Vainer private civil suit; and
> • a $1.5 billion financing to lower interest rate, extend maturities and enhance liquidity.
>
> The Company's TSR from the first quarter of 2000 (our CEO's first full quarter with the Company) through the fourth quarter of 2015 was approximately 3,298%, putting the Company in the top 10 of all current S&P 500 companies over that period.
>
> The Compensation Committee has developed and approved an executive compensation philosophy to provide a framework for the Company's executive compensation program featuring the following policies and practices:
> • *strong pay-for-performance alignment* . . . [Emphasis added.]

71.    Defendants' statements in the 2016 Proxy, which touted a purported "pay-for-performance" were false and misleading because they failed to disclose that the Company's financial performance (*i.e.*, revenues and profits) -- and any compensation

awarded based on it -- was based on illegal and/or illicit activity.

72.     Further, the 2016 Proxy was false and misleading because Defendants failed to disclose that: (1) Defendants caused the Company to purposefully steer patients into unnecessary insurance plans in order to maximize profits; (2) the Company (under Defendants' direction and on their watch) was using AKF as a vehicle to facilitate these improper practices; (3) as a result, DaVita's revenues and profits were illegally and/or illicitly obtained; (4) in turn, DaVita lacked effective internal controls over financial reporting; and (5) as a result of the foregoing, Defendants' statements about DaVita's business, operations, and prospects in both the 2016 Proxy and in other public filings were false and misleading and/or lacked a reasonable basis.

### C.     The Truth Begins to Emerge

73.     On July 1, 2016, UnitedHealth sued kidney-care chain American Renal for fraud.  The complaint, filed in federal court in the Southern District of Florida, accused American Renal of engaging in an illegal scheme to unlawfully obtain benefit payments from UnitedHealth for dialysis services rendered to vulnerable patients suffering from chronic kidney disease or ESRD.   The complaint alleged that American Renal systematically targeted Medicaid and Medicare-eligible patients and, through deception and unlawful means, convinced them to drop or reject their affordable government insurance options and enroll in UnitedHealth's commercial plans.  UnitedHealth then alleged that American Renal charged $4,000 per treatment for some of its patients when the typical reimbursement for Medicare and Medicaid plans is less than 10% of that rate.  Specifically, UnitedHealth's complaint alleged:

> 1. This action involves a fraudulent and illegal scheme by ARA – one of the country's largest providers of dialysis services – to unlawfully obtain

27

benefit payments from United for dialysis services rendered to vulnerable patients suffering from chronic kidney disease.

2. ARA has directed its deceptive conduct at United and United's commercial health insurance plans, and has caused United to make substantial payments to ARA that United would not have made had ARA acted truthfully and lawfully. ARA has preyed upon some of Florida's and Ohio's most vulnerable patients – ones suffering from end-stage renal disease ("ESRD") – converting them from patients to pawns in a scheme to maximize ARA's profits.

3. In fact, since the beginning of the year, ARA has systematically targeted these Medicaid- and Medicare-eligible patients and, through deception and unlawful means, has convinced them to drop or reject their affordable government insurance options and enroll in United's commercial plans.

4. The lone motivating factor behind ARA's patient conversion efforts is ARA's desire to maximize its own profits.

5. Medicaid and Medicare pay ARA a reimbursement rate of $300 or less for one session of dialysis services rendered to an ESRD patient (the Medicaid rates in Florida and Ohio are less than $200 for one session of dialysis services).

6. ARA is an out-of-network provider, rather than an "in-network" provider, for United's commercial plans. This means ARA does not have a contractually agreed upon rate for dialysis services rendered to patients insured under those plans. As an out-of-network provider, ARA believes it can bill United at rates that are as much as twenty times the rates it would receive from Medicaid and/or Medicare. As described below, ARA's out-of-network status has made United's commercial plans a particularly attractive target for ARA's scheme.

7. Knowing of its out-of-network status with United plans, and believing that it can bill United more than $4,000 for the same services being rendered to Medicaid- and Medicare-eligible ESRD patients, ARA has endeavored to cause those patients to drop their government insurance and enroll in United's commercial plans. For at least the past year, ARA has succeeded, causing many ESRD patients to move off of or away from Medicaid and/or Medicare and onto a commercial plan offered by United. ARA has then submitted charges to United seeking to be paid benefits for dialysis services rendered to those patients that exceed by a factor of more than twenty times the reimbursement amount ARA would receive were it to bill certain government insurance plans for those services.

8. To implement its scheme against United, ARA needed to overcome the financial limitations of the vulnerable patient population ARA wanted to use to increase its profits. Specifically, ARA needed to figure out how to convince ESRD patients (many of whom are indigent, and who, under their Medicaid and Medicare plans, had little to no personal financial responsibility for their medical and pharmaceutical benefits) to take on the premium, copay, coinsurance and deductible obligations associated with United commercial plans.

9. The solution ARA implemented was deceptive, fraudulent, and illegal.

10. First, ARA secured premium assistance from a third-party, the American Kidney Fund ("AKF"), to cover the patients' commercial plan premiums. Upon information and belief, AKF's financial assistance was funded by earmarked donations ARA made to the 501(c)(3) organization for this very purpose.

11. Second, ARA counseled patients and assisted them with enrollment in the commercial plans that were most favorable to ARA—i.e., plans that would result in the highest out-of-network reimbursement to ARA.

12. Third, ARA illegally, and in violation of the language of the applicable commercial plans, waived the patients' copay, coinsurance and deductible obligations to ARA.

13. Patients suffered in two ways as a result of ARA's scheme. First, upon information and belief, ARA intentionally failed to inform patients that AKF's premium assistance program was only available for patients receiving dialysis treatments and, consequently, none of the patients knew that they would be ineligible for premium assistance if they sought to cure their condition through a kidney transplant. Second, while ARA illegally agreed to waive the copays, coinsurance and deductibles patients owed to it, it could not guarantee that the patients' doctors, pharmacists, medical equipment suppliers, and other service providers would similarly break the law by doing the same.

14. ARA's actions violated several important criminal and civil laws, including Florida's prohibitions on false and fraudulent insurance claims (Fla. Stat. § 817.234), Florida's Patient Brokering Act (Fla. Stat. § 817.505), Florida's Anti- Kickback Statute (Fla. Stat. § 456.054), and Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 et seq.) ("FDUTPA").

15. Because ARA used unlawful means to move vulnerable ESRD patients onto commercial United plans, the services and treatments ARA provided to these patients after it implemented its scheme were not lawful

when rendered and were, therefore, ineligible for reimbursement.

16. United has already paid millions of dollars in benefits to ARA for claims ARA submitted as part of its illegal and unethical conversion and billing scheme.

74.     Thus, part of the alleged scheme involved a purported charitable foundation called the American Kidney Fund.   American Renal secured premium assistance from AKF to cover certain low income patients' commercial plan premiums and AKF's financial assistance was funded by earmarked donations American Renal made to AKF for this very purpose.  American Renal reportedly went as far as to counsel and assist patients with enrollment in the commercial plans that were most favorable to American Renal and waived the patients' copay, coinsurance and deductible obligations to American Renal, which was in violation of the language of the applicable commercial plans.  In turn, UnitedHealth would have no choice but to pay American Renal's inflated out-of-network charges.  American Renal's business practice of targeting patients already on dialysis into UnitedHealth insurance policies skewed the insured patient population and made it impossible for UnitedHealth to establish premiums based on its assessment of the general population's need for dialysis. American Renal's fraudulent practices, hence, increased health care costs for all insured patients.

75.     DaVita was not party to the UnitedHealth/American Renal lawsuit. However, American Renal is an industry peer of DaVita and Defendants caused DaVita to make substantial contributions to AKF.  Notably, the Chair of the AKF Board of Trustees, Gail S. Wick, served as vice president for nursing services at DaVita, where she was responsible for nursing manpower, care and practice for more than 540 dialysis facilities throughout the United States.

76.     On July 1, 2016, *The New York Times* discussed the lawsuit against American Renal, highlighting "[t]hat gaping price difference was the motivation for a scheme, orchestrated by a for-profit dialysis chain, that illegally pushed poor people . . . out of inexpensive government programs and into expensive private plans sold by UnitedHealthcare."  Regarding the AKF, the article noted that:

> The [AKF] has close ties to the dialysis industry: It acknowledges that dialysis companies pay for its premium-assistance program, and in 2015, 78 percent of its $264 million in revenue came from two companies, according to its financial disclosures. The kidney fund declined to name the companies. The organization's chairwoman is a former executive at DaVita and Fresenius Medical Care, the nation's two leading dialysis chains.
>
> Those industry ties expose the profit motive that underpins the programs, according to Patrick Burns, executive director of Taxpayers Against Fraud, a whistle-blower advocacy group.
>
> "There is a bottom line here, and the people who manage these programs are well aware of it, on both sides," he said.

77.     On August 8, 2016, Defendants caused DaVita to issue a press release announcing its financial results for the second quarter ended June 30, 2016.  For the quarter, DaVita reported net income of $53 million, or $0.26 per share, and consolidated net revenue of $3.72 billion, both of which topped analyst expectations.  However, Defendants caused the Company to slash its full-year consolidated operating income guidance to the range of $1.785 billion to $1.875 billion from earlier forecasts of $1.800 billion to $1.950 billion.

78.     On August 8, 2016, Defendants caused DaVita to hold a conference call with analysts and investors to discuss the Company's Q2 2016 results.  During the conference call, Javier J. Rodriguez, Kidney Care's CEO, indicated that the Company has been donating money to the AKF "to help patients with end-stage renal disease for

decades in order to be assisted with their premium."  During the conference call, the

following exchange regarding the AKF took place:

**John W. Ransom - Raymond James & Associates, Inc.**
That's a great answer, and I've a follow up for Javier. Just to push back a
little bit on this foundation issue. I mean, these patients, would be covered
by Medicare. It's not as though they would be bereft to health insurance or
then – I think, I've read 5,500 or so patients are now on exchanges, being
paid full by the foundations. I mean, aren't you arguing that United
Healthcare and Anthem should take, I don't know, $5,000-$10,000 in
premium and have a fair cost of over $100,000?

I mean, how can we make that argument to these plans, when they could
be covered under the public plans that's and I would assume, you guys
have your proportional share of the 5,500, just stepping back from kind of
a public policy standpoint. How do you, at a time when the plans are
losing money in the exchanges, how do you argue to them that they should
cover people that could be covered for a fraction of the cost under
Medicare?

**Defendant Thiry**
Yeah. A couple of things. If you're on Medicare, you're not eligible, as we
go on the exchange. And so, that is the benefit that you have. For the
patients, that switch, I don't know, if the number you cited is right or not,
we haven't disclosed those numbers. It is a very personal decision that is
based on access to specialists, drugs, and other things. So, the patient
actually do get differentiated care.

And so the reality of this thing is that the system, set it up for individuals
to make a choice as to what their best coverage is and so patients made
that choice, and it's a very personal decision that I can't decide whether
that's right or wrong for the system, but rather they get to make the choice.

79.     In reaction to the August 8, 2016 disclosures, DaVita's stock price

dropped $3.05 per share, or 4.05%, from $75.36 per share on August 8, 2016 to $72.31

per share on August 9, 2016.  On August 10, 2016, DaVita's stock price dropped an

additional $2.20 per share, or 3.04%.  These declines wiped out approximately $1.36

billion in Company market capitalization.

80.     On August 18, 2016, following the close of the financial markets, news

outlets began to report that the CMS had issued a "Request for Information" concerning

"Inappropriate Steering of Individuals Eligible for or Receiving Medicare and Medicaid

Benefits to Individual Market Plans." Specifically, CMS's request for information sought

public comment:

> regarding concerns about health care providers and provider-affiliated organizations steering people eligible for or receiving Medicare and/or Medicaid benefits to an individual market plan for the purpose of obtaining higher payment rates. CMS is concerned about reports of this practice and is requesting comments on the frequency and impact of this issue from the public. We believe this practice not only could raise overall health system costs, but could potentially be harmful to patient care and service coordination because of changes to provider networks and drug formularies, result in higher out-of-pocket costs for enrollees, and have a negative impact on the individual market single risk pool (or the combined risk pool in states that have chosen to merge their risk pools).  We are seeking input from stakeholders and the public regarding the frequency and impact of this practice, and options to limit this practice.

81.    The CMS request for information and letters was aimed at situations

where Medicare/Medicaid patients were steered into Affordable Care Act-compliant

plans which could have resulted in the disruption of care associated with a change in

network providers.  "We are concerned about reports that some organizations may be

engaging in enrollment activities that put their profit margins ahead of their patients'

needs," said CMS Acting Administrator Andy Slavitt.  "These actions can limit benefits

for those who need them, potentially result in greater costs to patients, and ultimately

increase the cost of Marketplace coverage for everyone."

82.    In addition to its information request, CMS was reportedly mulling its

regulatory and operational options to prohibit or limit premium payments and routine

waiver of cost-sharing for qualified health plans by health care providers, revisions to

Medicare and Medicaid provider enrollment rules, and the imposition of civil monetary

penalties for individuals who fail to provide correct information about consumers enrolled in a plan. CMS also anticipated potential changes allowing insurers to limit their payment to health care providers to Medicare-based amounts for certain services and items of care.

83.     In reaction to the disclosure about the CMS inquiry into the industry and the potential rule changes, DaVita's stock price dropped $3.17 per share, or 4.69%, from $67.65 per share on August 18, 2016 to $64.48 per share on August 19, 2016, wiping out approximately $625 million in Company market capitalization in a single day.

84.     Then, on Sunday, October 23, 2016, the *St. Louis Post* published an article entitled "DaVita encouraged some low-income patients to enroll in commercial plans" that accused DaVita directly of steering clients into private insurance providers. The article stated that internal e-mails from DaVita showed that the Company targeted some patients in a campaign to get them to buy insurance they did not need, saying that their monthly premiums would be paid by a nonprofit foundation – the AKF. The article, in part, asserted:

> Internal emails from DaVita HealthCare Partners Inc. show the Denver-based company targeted some patients in a campaign to get them to buy insurance they didn't necessarily need, saying their monthly premiums would be paid by a nonprofit foundation.
>
> DaVita, one of the nation's largest dialysis providers, with a major presence in St. Louis, had a financial incentive to get certain Medicaid-eligible dialysis patients to enroll in private insurance. Medicaid, the government-run health insurance program for low-income Americans, pays significantly less than traditional commercial insurance for dialysis treatment.
>
> *                   *                   *
>
> Based on the company's internal emails, the difference between "steering" and "educating" is a subtle one. Those communications, sent during last

year's open enrollment period, outline a systematic approach to "educate" hundreds of area patients — and thousands across the country — about individual health plans.

Those emails show that patients were told by DaVita dialysis center employees — either social workers or insurance counselors — that the American Kidney Fund would pay their monthly health insurance premiums so they could gain coverage that is usually out of reach financially. The DaVita employees were instrumental in helping patients enroll by helping complete applications for the plans and for the American Kidney Fund's health insurance premium assistance program. The initiative was referred to as the "Medicaid Opportunity" in internal emails. In regulatory filings, DaVita says it contributes to the American Kidney Fund, but doesn't specify how much. In 2015, the fund provided about $255 million worth of patient assistance to 93,000 kidney failure patients, according to its most recent filing with the Internal Revenue Service.

DaVita's dialysis center employees were given information on which patients to target for the program. From there, they were supposed to engage Medicaid patients in a conversation about new coverage options and the employees' progress was closely tracked.

\*     \*     \*

The internal emails from last fall's open enrollment tally each region's performance. The emails show regions were tracked by how many patients were interested in commercial coverage and the percentage of those that had been talked to by employees about their options.

"Hooray! The Village has completed over 75% of interest conversations, and over 7,200 patients will receive enrollment education on the specific plans available in their market," an email said. (Village is the company's term for itself.)

The goal outlined in the emails was to hit 100 percent of "interest conversations" by late October.

However, "disinterested" patients were also tracked and their cases were reviewed by division vice presidents and regional operational directors, according to the emails.

The emails instructed that division leadership teams should conduct weekly or biweekly calls to discuss "validation" for patients who are not interested in this opportunity.

85.     In reaction to the *St. Louis Post* article, DaVita's stock price dropped

$2.86 per share, or another 4.69%, from $60.96 per share on Friday, October 21, 2016 to $58.10 per share on Monday, October 24, 2016 — wiping out an additional $565 million in Company market capitalization.

86.     On October 31, 2016, Defendants caused DaVita to issue a press release announcing that it was suspending support for applications to the AKF for charitable premium assistance by patients enrolled in minimum essential Medicaid coverage, effective immediately.  Defendants estimated that a policy change that prevented patients with minimum essential Medicaid coverage from accessing charitable premium assistance would result in a reduction to its annualized operating income of up to approximately $140 million before any offsets.  That number would be higher by up to another $90 million if CMS issued a broader ruling that made access to charitable premium assistance unavailable to all patients.

87.     On January 6, 2017, Defendants caused DaVita to announce that it had received a subpoena from the U.S. Attorney's Office for the District of Massachusetts "seeking the production of information related to charitable premium assistance."  On that same day, *The Wall Street Journal* reported that the DOJ is "probing a controversial arrangement under which kidney-care companies support charitable efforts to help patients pay health-insurance premiums, according to disclosures from major dialysis providers."  The article disclosed that Fresenius Medical Care North America and the AKF had also been subpoenaed.

88.     As a result of Defendants' actions, the Company has suffered damages. These damages include (but are not limited to) financial harm, a decline in the Company's share price, damages associated with the DOJ investigation and the

investigation by the U.S. attorney for the District of Massachusetts, the potential of future fines and litigation related to the above-referenced issues, and severe loss of reputation and standing.

## DERIVATIVE AND DEMAND ALLEGATIONS

89.     Plaintiff brings this action derivatively in the right and for the benefit of DaVita to redress the breaches of fiduciary duty and other violations of law by Defendants.

90.     Plaintiff will adequately and fairly represent the interests of DaVita and its shareholders in enforcing and prosecuting its rights.

91.     The Board currently consists of the following twelve (12) directors: defendants Thiry, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, Valine and Yale, and non-defendant Pascal Desroches ("Desroches").  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the reasons that follow.

92.     Defendants Thiry, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, Valine and Yale (a majority of the Board) served as directors of the Company during some or all of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illegal and/or illicit acts alleged herein. The statements and actions regarding the illegal and/or illicit scheme to use AKF as a vehicle to steer patients into unnecessary insurance plans in order to maximize profits (as well as the other statements detailed herein) that defendants Thiry, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, Valine and Yale caused or allowed to occur and be made repeatedly were an integral aspect of the Company's core operations.

It was through these actions and statements that the Defendants were able to reap and report illegally and/or illicitly obtained profits.  It was these very actions and statements that defendants Thiry, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, Valine and Yale caused or allowed to occur and the Company to make that subjected DaVita to the investigations by the DOJ and U.S. Attorney's Office for the District of Massachusetts (as well as the possibility of additional investigations in the future).  This was in violation of (among other things) these Defendants' fiduciary duties of due care, good faith and loyalty, as well as the Code.  Thus, defendants Thiry, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, Valine and Yale (a majority of the Board) each faces a substantial likelihood of liability for their acts in connection with these statements, rendering a demand upon them futile.

93.    The Board's challenged misconduct at the heart of this case constitutes unlawful/illicit activity or the facilitation of illegal/illicit activity.  In essence, as the "ultimate decision-making body" of the Company, the Board affirmatively adopted, implemented, and/or condoned a business strategy based on violations of law and/or statutes (federal and/or state).  Breaking the law and/or violating a federal and/or state statute is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Significantly, a majority (eleven out of twelve) of the current Board members (defendants Thiry, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper, Valine and Yale) have served as directors during the period of time in which the illicit scheme was in full effect (and before the DOJ and U.S. Attorney's Office for the District of Massachusetts commenced their investigations).  A majority of the Board was or should have been alerted to the illegal and/or illicit activity,

which these Board members likewise participated in (thereby subjecting the Company to even more damages).

94.     Simply put, violating the law and/or statutes (federal and/or state), approving the violations of applicable law and/or statutes by others, or looking the other way while refusing to prevent others under the Board's control from violating the law and/or statutes are all forms of misconduct that cannot under any circumstance be examples of legitimate business conduct.   Because condoning a business strategy predicated on breaking the law and/or violating a federal statute cannot be a valid exercise of business judgement, demand upon the Board is excused.

95.     The principal professional occupation of defendant Thiry is his employment with DaVita as its CEO, pursuant to which he receives substantial monetary compensation and other benefits.   In addition, according to the 2016 Proxy, Defendants have admitted that defendant Thiry is not independent.   Thus, defendant Thiry  lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

96.     During the Relevant Period, defendants Berg, Davidson and Valine served as members of the Audit Committee.   Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, and ensuring that the Company was in compliance with legal and regulatory requirements (and the Code).   Defendants Berg, Davidson and Valine breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and

misleading statements in the Company's SEC filings and other disclosures, caused the above-discussed internal control failures, and caused or allowed the illicit activity described herein (which ultimately led the Company to become the subject of investigations by the DOJ and U.S. Attorney's Office for the District of Massachusetts). Upon information and belief (and pursuant to the rules set forth in the Audit Committee Charter), the Audit Committee met at least quarterly during the period in question. Therefore, it is readily apparent that the Audit Committee likely met multiple times during the period of misconduct and wrongdoing alleged herein.  Therefore, defendants Berg, Davidson and Valine face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

97.    During the Relevant Period, defendants Berg, Desoer, Diaz and Roper served as members of the Compliance Committee.  Pursuant to the Company's Compliance Committee Charter, the members of the Compliance Committee were and are responsible for, *inter alia*, overseeing and monitoring the effectiveness of the Company's healthcare regulatory compliance program, reviewing significant healthcare regulatory compliance risk areas, and together with the Audit Committee, reviewing the steps management was taking to monitor, control and report these risk exposures, assisting the Board with oversight of compliance with healthcare regulatory requirements; and primary responsibility for oversight of healthcare regulatory requirements and for directing the Company's response to certain pending governmental investigations.  Defendants Berg, Desoer, Diaz and Roper breached their fiduciary duties of due care, loyalty, and good faith, because the Compliance Committee, *inter alia*, allowed or permitted the Company to engage in the illegal and/or illicit activity detailed

herein (which ultimately led the Company to become the subject of investigations by the DOJ and U.S. Attorney's Office for the District of Massachusetts).   Upon information and belief (and pursuant to the rules set forth in the Compliance Committee Charter), the Compliance Committee met at least quarterly during the period in question.   Therefore, it is readily apparent that the Compliance Committee likely met multiple times during the period of misconduct and wrongdoing alleged herein.   Therefore, defendants Berg, Desoer, Diaz and Roper face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

98.   Notably, the members of the Compliance Committee and the members of the Audit Committee were specifically tasked with working together on issues involving oversight of enterprise risk management and healthcare legal and regulatory compliance. Collectively, the Audit Committee Defendants and the Compliance Committee Defendants (Berg, Davidson, Desoer, Diaz, Roper and Valine) constitute a majority of the Board.   These Defendants (a majority of the Board), who were tasked with working together, breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee and the Compliance Committee, *inter alia*, allowed or permitted the Company to engage in the illegal and/or illicit activity detailed herein (which ultimately led the Company to become the subject of investigations by the DOJ and U.S. Attorney's Office for the District of Massachusetts).   As such, defendants Berg, Davidson, Desoer, Diaz, Roper and Valine (a majority of the Board) face a substantial likelihood of liability for their breach of fiduciary duties, thus excusing demand on this basis alone.

99.   During the Relevant Period, defendants Arway, Diaz and Nehra served as members of the Public Policy Committee.   Pursuant to the Company's Public Policy

Committee Charter, the members of the Public Policy Committee were and are responsible for, *inter alia*, advising the Board on public policy and government relations matters and making recommendations to the Board of policies and procedures relating to issues of public policy and government relations.  Defendants Arway, Diaz and Nehra breached their fiduciary duties of due care, loyalty, and good faith, because the Public Policy Committee, *inter alia*, allowed or permitted the Company to engage in the illegal and/or illicit activity detailed herein (which ultimately led the Company to become the subject of investigations by the DOJ and U.S. Attorney's Office for the District of Massachusetts).  As set forth above, this activity included (but was not limited to) steering of beneficiaries of Medicare and Medicaid (both governmental programs) into other plans in order to earn higher reimbursement rates.  Therefore, defendants Arway, Diaz and Nehra face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

100.     Defendants Thiry, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper and Valine (a majority of the Board) each signed the false and misleading 2015 10-K.  The 2015 10-K, signed and authorized by these Defendants, was false and misleading because it falsely stated and/or failed to disclose that: (1) Defendants caused the Company to purposefully steer patients into unnecessary insurance plans in order to maximize profits; (2) the Company (under Defendants' direction and on their watch) was using AKF as a vehicle to facilitate these improper practices; (3) as a result, DaVita's revenues and profits were illegally and/or illicitly obtained; (4) in turn, DaVita lacked effective internal controls over financial reporting; and (5) as a result of the foregoing, Defendants' statements about DaVita's business, operations,  and prospects were false

and misleading and/or lacked a reasonable basis.  As a result, defendants Thiry, Arway, Berg, Davidson, Desoer, Diaz, Grauer, Nehra, Roper and Valine (a majority of the Board) each face a substantial likelihood of liability for their actions described herein, rendering any demand upon them futile.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

101.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.   As alleged herein, each of the Defendants had a fiduciary duty to, among other things, ensure that the Company and its subsidiaries were operated in a lawful manner, and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems being experienced with the Company's and/or its subsidiaries' business practices and operations, should have exercised good faith in taking appropriate action to correct the misconduct and to prevent its recurrence.

103.   The Defendants willfully ignored the obvious and pervasive problems being experienced with DaVita's internal controls practices and procedures, and failed to make a good faith effort to correct these problems or prevent their recurrence, which ultimately led to the Company becoming the subject of investigations by the DOJ and the U.S. Attorney's Office for the District of Massachusetts.

104.   Additionally, as alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that DaVita disseminated accurate, truthful and complete information to its shareholders.

105.   The Defendants violated their fiduciary duties of care, loyalty, and good

faith by causing or allowing the Company to disseminate to DaVita shareholders materially misleading and inaccurate information through, *inter alia*, DaVita's SEC filings and other public statements and disclosures as detailed herein, which failed to disclose that the Company was being operated in an unlawful and/or illicit manner. These actions could not have been a good faith exercise of prudent business judgment.

106.    The Defendants' misconduct alleged herein further constituted an abuse of their ability to control and influence DaVita and its subsidiaries, for which they are legally responsible.  In particular, the Defendants abused their positions of authority by causing or allowing DaVita and its subsidiaries to misrepresent material facts regarding its business operations and practices (including the steering of patients with government-subsidized health insurance into private health insurance plans to maximize Company profits), financial position and business prospects.

107.    Defendants had a duty to DaVita and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of DaVita and its subsidiaries.

108.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of DaVita and its subsidiaries in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of DaVita's affairs, and in the use and preservation of DaVita's assets.

109.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct,

yet Defendants caused DaVita and/or its subsidiaries to engage in the illegal and/or illicit scheme complained of herein which they knew had an unreasonable risk of damage to DaVita, thus breaching their duties to the Company.  As a result, the Defendants grossly mismanaged DaVita.

110.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

111.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

112.    Plaintiff, on behalf of DaVita, has no adequate remedy at law.

**COUNT II**
**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

113.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

114.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of DaVita in the form of, *inter alia¸* salaries, bonuses, stock options, and/or other forms of executive compensation.

115.    Plaintiff, as a shareholder and representative of DaVita, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT III**
**AGAINST ALL DEFNDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934**

116.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

45

117.   Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. §240.14a-9. Specifically, the 2016 Proxy violated §14(a) and Rule 14a-9 because it solicited DaVita shareholder votes for, *inter alia*, director reelection and executive compensation, while simultaneously misrepresenting and/or failing to disclose that (1) Defendants caused the Company to purposefully steer patients into unnecessary insurance plans in order to maximize profits; (2) the Company (under Defendants' direction and on their watch) was using AKF as a vehicle to facilitate these improper practices; (3) as a result, DaVita's revenues and profits were illegally and/or illicitly obtained; (4) in turn, DaVita lacked effective internal controls over financial reporting; and (5) as a result of the foregoing, Defendants' statements about DaVita's business, operations,  and prospects were false and misleading and/or lacked a reasonable basis.

118.   As alleged herein, in the 2016 Proxy, Defendants specifically referenced the Code, which required the compliance with all laws, rules, and regulations.  Because the Company, under Defendants' direction and on their watch, was affirmatively engaging in illegal/illicit activity in violation of laws, statutes and/or regulations, Defendants affirmatively violated the Code.  Not only did the 2016 Proxy not disclose these illicit activities, but it likewise did not disclose that the express terms of the Code were being violated.

119.   Finally, in the 2016 Proxy, Defendants repeatedly falsely touted that the

proposed executive compensation packages (which were voted on by the Company's shareholders) were based on a so-called "pay-for-performance" metric. For instance, in the 2016 Proxy, Defendants caused the Company to state that "the Company believes that its executive compensation program is reasonable, competitive and strongly focused on pay-for-performance principles" and cited consolidated net revenue and net revenue growth has factors indicating purportedly strong performance.

120.    Defendants' statements in the 2016 Proxy, which touted a purported "pay-for-performance" philosophy and specifically highlighted financial performance (including revenue) were false and misleading because they failed to disclose that the Company's financial performance (*i.e.*, revenues and profits) under Defendants' direction and on their watch--and any compensation awarded based on it--was based on Defendants' illegal and/or illicit activity.

121.    In the exercise of reasonable care, Defendants should have known that the statements contained in the 2016 Proxy were materially false and misleading.

122.    The misrepresentations and omissions in the 2016 Proxy were material. The 2016 Proxy was an essential link in the accomplishment of the continuation of Defendants' scheme by which they claim to adhere to, *inter alia*, the express terms of the Code and Governance Principles.

123.    In the exercise of reasonable care, Defendants should have known that the statements contained in the 2016 Proxy were materially false and misleading, and/or that the Proxy omitted material information. The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2016 Proxy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing DaVita to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to DaVita restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 10, 2017

**RIGRODSKY & LONG, P.A.**

*/s/ Brian D. Long*
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)

**OF COUNSEL:**

Gina M. Serra (#5387)
Jeremy J. Riley (#5791)

**Profy Promisloff & Ciarlanto, P.C.**
Jeffrey J. Ciarlanto
Joseph M. Profy
David M. Promisloff
100 N 22nd Street, Unit 105
Philadelphia, PA 19103
Phone: (215) 259-5156
Fax: (215) 600-2642

2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel.: (302) 295-5310
Fax: (302) 654-7530
sdr@rl-legal.com
bdl@rl-legal.com
gms@rl-legal.com
jjr@rl-legal.com

**Law Office of Alfred G. Yates, Jr., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033

*Attorneys for Plaintiff*