**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re DaVITA INC. STOCKHOLDER DERIVATIVE LITIGATION | : : : | |
| This Document Relates To: | : : | Civil Action No. 17-152-MPT |
| ALL ACTIONS. | : : | |

## MEMORANDUM ORDER

### I. INTRODUCTION

In this consolidated stockholder derivative action,[1] lead plaintiff City of Warren Police and Fire Retirement System ("lead plaintiff"), on behalf of itself and other plaintiffs consolidated into this action (collectively, "plaintiffs"), alleges that defendants DaVita, Inc. ("DaVita" or "the company") and certain current and/or former members of DaVita's Board of Directors (the "Board") (collectively, "defendants") breached their fiduciary duties, unjustly enriched themselves, committed corporate waste, and violated Section 14(a) of the Securities Exchange Act of 1934 from at least 2015 through September 29, 2017 (the "Relevant Period").[2] Presently before the court is defendants' motion to dismiss (the "motion to dismiss") the Verified Consolidated Shareholder Derivative Complaint (the "Complaint") as well as plaintiffs' motion to strike (the "motion to strike") materials attached to the motion to dismiss and discussed in defendants' accompanying memoranda of law.[3] For the reasons discussed herein, the motion to strike is GRANTED and the motion to dismiss is DENIED.

---

[1] D.I. 11.
[2] D.I. 13.
[3] D.I. 23; D.I. 28.

## II.   BACKGROUND

### A.   Procedural Background

The case at bar originates in a complaint filed on February 10, 2017 by Charles Blackburn.[4] By stipulation, in August 2017, Mr. Blackburn and the plaintiffs in two other actions, *Gabilondo v. Thiry et al.*, Civil Action No. 1:17-cv-00653; and *City of Warren Police and Fire Retirement System v. Diaz et al.*, Civil Action No. 1:17-cv-00709, agreed to consolidate their lawsuits into a single action led by lead plaintiff.[5] On August 23, 2017, the parties filed a Notice, Consent, and Reference of a Civil Action to a Magistrate Judge, in which they consented to the Court conducting all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings.[6] The District Court ordered that this consent was effective as of that same day.[7] Lead plaintiff filed an amended Verified Consolidated Shareholder Derivative Complaint (the "Complaint") on September 29, 2017.[8]

On October 17, 2017, the court granted the parties' stipulated schedules for filing motions to stay and to dismiss.[9] Pursuant to that schedule, defendants moved on December 18, 2017 to dismiss the Complaint[10] and to stay this action pending the outcome of motions to dismiss in a related action in the District of Colorado, *Peace Officers Annuity and Benefit Fund of Georgia v. DaVita Inc. et al.*, Civil Action No. 1:17-cv-00304-WJM-MJW.[11] Defendants move to dismiss, pursuant to Rules 12(b)(6) and 23.1, "on the grounds that Plaintiffs . . . failed to make demand on the DaVita Board of Directors."[12] Plaintiffs oppose the motion and request, "[s]hould the Motion to Dismiss

---

[4] D.I. 1.
[5] D.I. 8; D.I. 9, D.I. 10, D.I. 11.
[6] D.I. 12.
[7] *Id*.
[8] D.I. 13.
[9] D.I. 16.
[10] D.I. 23.
[11] D.I. 20.
[12] D.I. 23.

be sustained in any part," leave to amend under Rule 15(a).[13] In addition, plaintiffs move to strike materials attached to and discussed in defendants' memorandum of law in support of the motion to dismiss.[14] All three motions were fully briefed on May 4, 2018.[15]

On June 25, 2018, the court granted the motion to stay,[16] which continued through status conferences on November 1, 2018 and January 7, 2019.[17] On January 7, 2019, with no decision yet issued in the Colorado action, the Court ordered the parties to submit a joint proposed scheduling order.[18] The parties submitted the proposed schedule on February 8, 2019,[19] which the court ordered into effect on February 28, 2019.[20] On March 28, 2019, the District of Colorado denied the pending motions to dismiss in the related securities action.[21] Two motions are presently before the court: defendants' motion to dismiss[22] and plaintiffs' motion to strike.[23]

---

[13] D.I. 30 at 30.
[14] D.I. 28, D.I. 29.
[15] D.I. 32, D.I. 33, D.I. 34.
[16] D.I. 37.
[17] D.I. 42.
[18] D.I. 44.
[19] D.I. 47.
[20] D.I. 48.
[21] *Peace Officers Annuity and Benefit Fund of Ga. v. DaVita Inc. et al*., No. 17-CV-0304-WJM-NRN, 2019 WL 1403070 (D. Colo. Mar. 28, 2019).
[22] D.I. 23.
[23] D.I. 28.

## B.     Allegations in the Complaint

DaVita is in the business of offering "kidney dialysis services for patients suffering from chronic kidney failure or end-stage renal disease ('ESRD')."[24]  The allegations in the Complaint broadly address DaVita's policies and actions related to the company's dialysis patients whose medical coverage is provided by Medicaid and Medicare.  Since the motion to dismiss is limited to demand excusal, rather than recite the extensive allegations in the Complaint, the court discusses the following pertinent allegations and inferences.

First, the relationship between private insurance ESRD dialysis patients and DaVita's bottom line was disclosed by DaVita.[25] For instance, DaVita stated in public filings that it was "los[ing] money on each Medicare treatment that [it] provide[d]"[26] and that "[n]early all of [DaVita's] net earnings from [] dialysis and related lab services [were] derived from commercial payors[.]"[27] This was a known challenge to DaVita's profitability.

Second, the Board approved a company strategy to donate approximately $100 million annually to American Kidney Foundation ("AKF").[28] DaVita did not publicly disclose the fact of this donation, or its amount.[29] AKF devotes most of its annual budget to a "premium assistance" program that funds private insurance premiums for ESRD dialysis patients.[30] Thus, DaVita expected that the bulk of its substantial donations to AKF would support AKF's premium assistance program.[31]

Third, AKF's premium assistance program favors dialysis services provided by its

---

[24] D.I. 13 at ¶ 2.
[25] D.I. 30 at 10.
[26] D.I. 13 at ¶ 74.
[27] *Id.*
[28] *Id.* at ¶¶ 95, 109.
[29] *Cf. id.* at ¶¶ 97–98 (detailing DaVita's announcement that it had been "donating money to the AKF" and the accompanying fall in share price).
[30] *Id.* at ¶ 95.
[31] *Id.* at ¶ 97.

donors (including DaVita) over all other treatment alternatives and providers. In fact, AKF's program stops paying patients' private insurance premiums in the event that these patients seek a kidney transplant.[32] Moreover, "social workers at independent and smaller dialysis organizations . . . [have had] difficulty in obtaining AKF grants for their dialysis patients. . . . [,] because of their clinic's inability to donate [to AKF]."[33] It is reasonable to infer that, as a substantial donor to AKF, DaVita was aware of AKF's policies. Thus, DaVita was reasonably certain that the vast majority of its contributions to AKF would support private health insurance premiums for DaVita's dialysis patients participating in AKF's premium assistance program, and that, on the AKF program, those patients would remain on dialysis.

Fourth, DaVita management engaged in a systematic plan to direct ESRD dialysis patients on Medicaid to AKF's premium assistance program. In DaVita's "Medicaid Opportunity" initiative, company employees "engage[d] Medicaid patients in a conversation about new coverage options[.]"[34] DaVita had aggressive goals, and it tracked its employees progress in converting Medicaid patients.[35] Moreover, when Medicaid patients had been approached but were categorized as "disinterested" in pursuing private insurance, their cases were reviewed by "divisional vice presidents and regional operational directors" who held weekly or bi-weekly conference calls "to discuss 'validation' for [these] patients[.]"[36] Company managers were compensated specifically based upon performance in the Medicaid Opportunity initiative, and this "pay-for-performance" approach was extended to DaVita's top management through an advisory vote discussed in the company's 2016 Proxy Statement.[37] DaVita did not publicly disclose its performance in this initiative, including the number of Medicare patients who

---

[32] *Id.* at ¶¶ 6, 92, 108.
[33] *Id.* at ¶ 111.
[34] *Id.* at ¶ 103.
[35] *Id.*
[36] *Id.*
[37] *Id.* at ¶¶ 152–53.

were ultimately enrolled in AKF private insurance programs.[38] Therefore, the Medicaid Opportunity initiative was a concerted effort by DaVita management to convert money-losing dialysis patients on Medicaid into profitable dialysis patients on private insurance plans.

Fifth, it is reasonable to infer that these efforts are contrary to DaVita's stated policies concerning charitable contributions. For example, DaVita's "Code of Conduct" materials discuss charitable contributions:

> Charitable contributions may be made to outside charities, on DaVita's behalf, with proper approvals from D-COMM in the U.S. or Team Quest outside the U.S.[39] *We do not participate in charitable activities or make charitable contributions to improperly induce referrals, to illegally gain an unfair business advantage, or in violation of the law*.
>
> Because we are a Village, we help each other and our greater community. We are encouraged to volunteer for charitable activities. However, no person may pressure another to do so. We may also participate in non-DaVita-sponsored charitable activities as long as it does not affect our work.[40]

This Code of Conduct applies to company employees as well as Board members.[41]

Sixth, the Complaint details several lawsuits, reports, and investigations that publicly suggest that DaVita's activities concerning AKF and the Medicaid Opportunity initiative were illicit, illegal, or both illicit and illegal. For instance, the Complaint discusses insurance company, UnitedHeath's suit against DaVita's industry peer, American Renal, which was filed in July 2016 and was ultimately the subject of an article in the *New York Times*.[42] In an August 2016 conference call discussing quarterly results, company management stated that DaVita had been donating money to AKF

---

[38] *Id.* at ¶ 97 ("[W]e haven't disclosed those numbers.").
[39] The court notes that "D-COMM" refers to DaVita's corporate communications team and "Team Quest" is the company's corporate compliance team.
[40] D.I. 13 at ¶ 44 (emphasis added).
[41] *Id.*
[42] *Id.* at ¶¶ 92–95.

but, when asked by a financial analyst, did not disclose the results of the Medicaid Opportunity initiative.[43]  Subsequently, the Centers for Medicare & Medicaid Services ("CMS") sought public comment "concerning 'Inappropriate Steering of Individuals Eligible for or Receiving Medicare and Medicaid Benefits to Individual Market Plans.'"[44] In October 2016, an article appeared in the *St. Louis Post-Dispatch*, discussing DaVita and the Medicaid Opportunity initiative.[45] A few months later, on January 6, 2017, shortly before plaintiff filed suit in the case at bar,[46] DaVita announced that "it had received a subpoena from the U.S. Attorney's Office for the District of Massachusetts 'seeking the production of information related to charitable premium assistance.'"[47] "On that same day, *The Wall Street Journal* reported that the DOJ is 'probing a controversial arrangement under which kidney-care companies support charitable efforts to help patients pay health-insurance premiums, according to disclosures from major dialysis providers.'"[48] "The article disclosed that Fresenius Medical Care North America and the AKF had also been subpoenaed."[49] These announcements reasonably support the inference that, in some way, the company's activities involving AKF were illegal and/or illicit and could expose the company to various liabilities.

---

[43] *Id.* at ¶¶ 96–97.
[44] *Id.* at ¶¶ 99–101.
[45] *Id.* at ¶ 103.
[46] D.I. 1.
[47] D.I. 13 at ¶ 106.
[48] *Id.*
[49] *Id.*

## C.      Demand Futility

Plaintiffs allege that demand on the Board is excused, because:  (1) the Board approved a business strategy that is not "a valid exercise of business judgement,"[50] (2) many of the members of the Board are interested or lack independence,[51] and (3) various combinations of directors, including a majority of the Board as well as on various committees of the Board, face a substantial likelihood of personal liability.[52]

## III.    STANDARD OF REVIEW

### A.      Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. The purpose of a motion under Rule 12(b)(6) is to test the sufficiency of the complaint, not to resolve disputed facts or decide the merits of the case.[53] "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims."[54] A motion to dismiss may be granted only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief."[55] While the court draws all reasonable factual inferences in the light most favorable to a plaintiff, it rejects unsupported allegations, "bald assertions," and "legal conclusions."[56]

---

[50] D.I. 13 at ¶ 121; *see also id.* at ¶¶ 119–20.

[51] *Id.* at ¶¶ 122, 128–29.

[52] *Id.* at ¶¶ 123–27.

[53] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[54] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotations and citations omitted); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) (A[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder.@).

[55] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (citing *Burlington*, 114 F.3d at 1420).

[56] *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted); *see also Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) (citations omitted) (rejecting Aunsupported conclusions and unwarranted inferences@); *Associated Gen. Contractors of Cal., Inc. v. Cal. State*

To survive a motion to dismiss, a plaintiff=s factual allegations must be sufficient to "raise a right to relief above the speculative level . . . ."[57] Plaintiffs are therefore required to provide the grounds of their entitlement to relief beyond mere labels and conclusions.[58] Although heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged.[59] A claim has facial plausibility when a plaintiff pleads factual content sufficient for the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.[60] Once stated adequately, a claim may be supported by showing any set of facts consistent with the allegations in the complaint.[61] Courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record when reviewing a motion to dismiss.[62]

### B.     Rules 12(d) & 56

Under Rule 12(d), "[i]f on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."[63] In such a circumstance, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."[64]

---

*Council of Carpenters*, 459 U.S. 519, 526 (1983) (AIt is not . . . proper to assume [plaintiff] can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged.@).

[57] *Twombly*, 550 U.S. at 555 (citations omitted); *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

[58] *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

[59] *Twombly*, 550 U.S. at 570; *see also Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (AIn its general discussion, the Supreme Court explained that the concept of a >showing= requires only notice of a claim and its grounds, and distinguished such a showing from >a pleader's bare averment that he wants relief and is entitled to it.=@) (quoting *Twombly*, 550 U.S. at 555 n.3).

[60] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[61] *Twombly*, 550 U.S. at 563 (citations omitted).

[62] See, e.g., *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).

[63] Fed. R. Civ. P. 12(d).

[64] *Id.*

Should the court convert the motion and consider the matter outside the pleadings, a grant of summary judgment pursuant to Rule 56 is appropriate if materials on the record, such a deposition, documents, electronically stored information, admissions, interrogatory answers, affidavits and other like evidence show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[65] The movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party=s case."[66] "Facts that could alter the outcome are >material,= and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[67] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[68]

### C.    Rule 23.1

Pursuant to Rule 23.1, shareholder derivative actions face a heightened pleading standard. The verified complaint must:

> (3) state with particularity:
>
> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
>
> (B) the reasons for not obtaining the action or not making the effort.[69]

"Although Rule 23.1 provides the pleading standard for derivative actions in federal court, the substantive rules for determining whether a plaintiff has satisfied that standard

---

[65] *Id.* 56 (a), (c).
[66] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[67] *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted).
[68] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted).
[69] Fed. R. Civ. P. 23.1(b)(3).

'are a matter of state law.'"[70] "Thus, federal courts hearing shareholders' derivative actions involving state law claims apply the federal procedural requirement of particularized pleading, but apply state substantive law to determine whether the facts demonstrate [that] demand would have been futile and can be excused."[71]

In this regard, "the entire question of demand futility is inextricably bound to issues of business judgment and the standard of that doctrine's applicability."[72] The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[73] Therefore, the burden is on the party challenging a board's decision to establish facts rebutting the presumption that the business judgment rule applies.[74] By promoting the exhaustion of intracorporate remedies as an alternate dispute resolution over immediate recourse to litigation, "the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations."[75]

In *Aronson v. Lewis*, the Delaware Supreme Court characterized the exercise of determining demand futility as deciding "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[76] The *Aronson* test is disjunctive,[77] which means that "if either

---

[70] *King v. Baldino*, 409 F. App'x 535, 537 (3d Cir. 2010) (citing *Blasband v. Rales*, 971 F.2d 1034, 1047 (3d Cir. 1992)).

[71] *Kantor v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007).

[72] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000).

[73] *Id.* (citations omitted); *see also Beam ex. rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004) (emphasis in original) (footnote omitted) ("The key principle upon which this area of our jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties.").

[74] *Levine v. Smith*, 591 A.2d 194, 205-06 (Del. 1991).

[75] *Aronson*, 473 A.2d at 812.

[76] *Id.* at 814.

[77] *Brehm*, 746 A.2d at 256.

prong is satisfied, demand is excused."[78]

While the focus in *Aronson* is on a specific decision of the board of directors, in *Rales v. Blasband*, the Delaware Supreme Court explained that "a court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit."[79] In one of "three principal scenarios[,]"[80] a court following the *Rales* test must determine "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[81]

## IV. DISCUSSION

In the motion to dismiss, defendants contend that plaintiffs have failed to excuse demand on DaVita's Board of Directors (the "Board") under Rules 12(b)(6) and 23.1.[82] However, defendants' memorandum of law in support of the motion to dismiss lacks similar clarity.[83] In this brief, it is apparent that defendants disagree with plaintiffs' interpretation of many of the facts alleged in the Complaint.[84] At the same time, defendants raise numerous factual disputes and seek to have the court consider and take judicial notice of a substantial volume of material outside the Complaint.[85] Plaintiffs oppose the motion[86] and move to strike the materials outside the Complaint.[87]

---

[78] *Id.* (footnote omitted).
[79] *Rales v. Blasband*, 634 A.2d 927, 933–34 (Del. 1993).
[80] *Id.* at 934. These three scenarios are: "(1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation." *Id.*
[81] *Id.*
[82] D.I. 23.
[83] See generally D.I. 24.
[84] See generally *id.*
[85] See generally *id.*
[86] D.I. 30.
[87] D.I. 28.

Based upon the seventy-eight pages of briefing on the motion to dismiss, the court notes that the briefs and the myriad arguments contained therein fail to comply with the Local Rules in a number of ways, including citation practice, form, and compliance with page limits. Also, it is clear that the factual disputes are not presented in a manner to facilitate summary judgment should the court be inclined to consider the matter outside the Complaint.[88] Thus, the court must decide whether to exclude the materials outside the pleadings.[89]

Before the court addresses this question in relation to defendants' motion to strike, it must first satisfy itself, pursuant to the Local Rules, which arguments are reasonably presented in the briefing. Of those arguments and associated materials, the court will then determine which remaining materials, if any, should be stricken as comprising material beyond the pleadings. Thereafter, the court shall address the motion to dismiss.

A.      The Local Rules

The parties' briefing deviates from the Local Rules in a number of aspects discussed herein, including citation practice and the form of the briefs. Not only is this inconvenient to the court, but it has led the court to decline to consider several of the myriad arguments raised by the parties.

---

[88] *See supra* Part III.B.
[89] Fed. R. Civ. P. 12(d).

### 1.    The parties do not cite to "D.I." number

In what has become an increasingly-common practice in this court, the six briefs before the court[90] contain varied and inconsistent citations to the record.[91] The parties have opted to give names to various documents, but the parties do not apply these names consistently. For example, defendants' memorandum of law in support of their motion to dismiss is docketed at D.I. 24. In the various briefs, plaintiffs refer to this document as "Motion[,]"[92] "ECF No. 24[,]"[93] and "Defs' Mem."[94] Defendants refer to this same document as "Motion to Dismiss[,]"[95] "MTD[,]"[96] "Memorandum[,]"[97] and "Mem."[98] Of course, it is misleading to refer to this memorandum of law as a "motion," because the motion is docketed separately at D.I. 23.

The court's U.S. District Advisory Committee has published Local Rule 7.1.3(a)(6) "Citation By Docket Number," which states that "[r]eferences to earlier-filed papers in any civil action shall include a citation to the docket item number as maintained by the Clerk in the following format: 'D.I.' followed by the docket item number of the paper."[99] Counsel is reminded to take note.

---

[90] These are D.I. 24; D.I. 29; D.I. 30; D.I. 31; D.I. 32; D.I. 34.

[91] *E.g.*, D.I. 34 at 3 n.2 ("*Compare* Mem. at 13–14, *with* Opp. at 7–8."). When multiple motions are before the court at once, "Mem." identifies more than one brief. The same is true for "Opp."

[92] D.I. 29 at 1.

[93] *Id.*

[94] D.I. 30 at 11 n.6, 25 n.8, 28.

[95] D.I. 31 at 1.

[96] *Id.* at nn.2–6.

[97] D.I. 34 at 1 n.1.

[98] *Id.*

[99] D. Del. LR 7.1.3(a)(6).

## 2. Arguments outside the "Argument" section of the briefs

Consistent with Rule 7(b)'s requirement that a motion must "state with particularity the grounds for seeking the order[,]"[100] the Local Rules identify a section of the brief containing "[a] summary of argument, setting forth in separately numbered paragraphs the legal propositions upon which the party relies."[101] According to Local Rule 7.1.3(c)(1), the body of the brief should contain a "concise statement of facts, with supporting references to the record, presenting the background of the questions at issue[]"[102] followed by "[a]n argument, divided under appropriate headings distinctly setting forth separate points."[103]

Defendants' brief in support of its motion to dismiss contains numerous arguments and citations to materials. Front-and-center in the "Introduction" section of this brief, defendants include what appears to be an argument in a page-long footnote.[104] The remainder of this section includes multiple arguments about disputed facts.[105] The "Background" section also includes extensive attorney argument challenging the facts alleged in the Complaint, discussing documents that supposedly contradict the allegations in the Complaint, and introducing various materials outside the Complaint.[106]

It is the moving party's burden to clearly and cogently state its reasons for dismissal in the "Argument" section of its brief. Therefore, the court declines to consider arguments found outside the "Argument" sections of the briefing.

---

[100] Fed. R. Civ. P. 7(b)(1)(B).
[101] D. Del. LR 7.1.3(c)(1)(D).
[102] *Id.* 7.1.3(c)(1)(E).
[103] *Id.* 7.1.3(c)(1)(F).
[104] D.I. 24 at 1-2 n.1; *see also id.* at 6 n.3.
[105] *Id.* at 2–5.
[106] D.I. 25 at 6–12 & nn.3–7.

### 3.    Use of footnotes

The parties employ footnotes in two ways that are at cross purposes with the requirements under the Local Rules defining citation practice, setting page-lengths,[107] and specifying that arguments are to be set out in "separate points."[108] First, defendants have placed numerous lengthy citations in footnotes.[109] This is contrary to the Local Rules.[110] Second, both parties have made arguments in footnotes.[111] These arguments present the court with numerous alternative and expansive reasons for dismissal.[112]

The parties have made numerous arguments in the text of the briefs and have supported those arguments with inline, textual citations. While the court declines to speculate why, in specific circumstances, the parties have opted to place citations and arguments in footnotes, the court nonetheless concludes that the use of single-spaced footnotes (instead of double-spaced text) for these purposes alters the page length of the briefs and effectively allows a party additional pages of briefing. Moreover, defendants' practice of voicing arguments in footnotes fails to place the opposing parties, as well as the court, on notice of defendants' grounds for dismissal. Therefore, in order to enforce the stipulated page limits and the form of the briefs as defined by the Local Rules, the court declines to consider these footnotes.

---

[107] D. Del. LR 7.1.3(a)(4); D.I. 15; D.I. 16.
[108] D. Del. LR 7.1.3(c)(1)(F).
[109] D.I. 24 at 19 & n.14, 19–20 & n.15, 26 & n.17; D.I. 34 at 4 & n.3, 11 & n.5; D.I. 31 at 4 & n.7, 6 & n.9.
[110] *See* D. Del. LR 7.1.3(a)(5) (specifying citation according to the Bluebook); *see also The Bluebook: A Uniform System of Citation* R. B1.1, at 3 (Columbia Law Review Ass'n et al. eds., 20th ed. 2015) (In briefs, "citations generally appear within the text of the document immediately following the propositions they support.").
[111] D.I. 24 at 14 nn.9–11, 17 n.12, 19 n.13, 22 n.16, 28 n.18; D.I. 30 at 11 n.6, 21 n.7, 25 n.8, 30 n.9; D.I. 34 at 3 n.2, 7 n.4, 14 n.6; D.I. 31 at 3 n.6, 6 n.8, 8 n.10; D.I. 32 at 2 n.1.
[112] *See, e.g.*, D.I. 24 at 14 nn.9–11.

### B.      Motion to Strike[113]

As discussed above, the record presented by defendants is insufficient to support summary judgment; therefore, the court will consider whether to exclude the material outside the Complaint in the context of the motion to strike.[114] Presently before the court are two aspects of the motion to strike:  (1) the public-record materials;[115] and (2) the materials attached to the motion to dismiss.[116]

Plaintiffs have moved to strike these materials on the basis that defendants ask the court to consider "factual assertions" and to draw "inferences therefrom[.]"[117] Defendants answer that, based upon the substance of these materials, "[p]laintiffs know that this information undermines their claims."[118] In essence, defendants ask the court to take judicial notice of various aspects of the "public record," which they contend contradict the allegations in the Complaint, and to decide the motion to dismiss based upon this alternate set of facts.[119]

---

[113] **In the answering brief in opposition to the motion to strike, defendants attach a footnote to the "Argument" heading of that brief in which they contend that the motion to strike is "procedurally improper[ under Rule 12(f),] because the rules authorizing motions to strike do not apply to motions to dismiss or their supporting papers." D.I. 31 at 3 n.6. Plaintiffs oppose the motion. D.I. 32 at 3–4. As discussed above, the court declines to consider this argument. *See supra* Part IV.A.3.**

[114] Fed. R. Civ. P. 12(d).

[115] In their opening brief in support of the motion to dismiss, defendants ask the court to take judicial notice of various websites, the holdings of other courts, and the opinions of administrative bodies. D.I. 24 at 1 n.1, 7 n.4, 7–9, 11 & nn.5–7, 21 & n.14, 22 & n.15.

[116] D.I. 25-1, exs. A–D.

[117] D.I. 29 at 1. In the alternative, should the court decide to consider these materials, plaintiffs move to convert the motion to dismiss to a motion for summary judgment under Rule 12(d) and open discovery concerning the issues of fact raised by defendants. *Id.* at 2.

[118] D.I. 31 at 1.

[119] *Id.* at 3–7. Defendants' contend that, because the court may take judicial notice of certain facts, it is inappropriate for the court to convert the motion to summary judgment or to open discovery. *Id.* at 7–10.

### 1.    Public-record materials

In the "Argument" section of their opening brief on the motion to dismiss, defendants appear to seek broad declaratory relief that "[l]egally, no court, government body or administrative agency has found that anything DaVita did was improper."[120] The factual basis for this conclusion is limited to attorney argument stringing together various Medicare regulations and guidance found in the public record.[121] In addition, defendants ask the court to take judicial notice of the findings of the United States District Court for the Eastern District of Texas[122] in *Dialysis Patient Citizens v. Burwell*.[123] Defendants cite to no other materials relevant to their argument.[124] In the reply brief on the motion to dismiss, defendants claim "by [p]laintiffs' own formulation, the survival of their Complaint rests solely on whether they have adequately alleged that DaVita violated the law."[125] Defendants contend that plaintiffs have not met this burden.

When plaintiffs moved to strike, defendants used the briefing as an opportunity to ask the court to take judicial notice of *an even broader range* of materials.[126] Although these additional administrative documents and court decisions were not specifically discussed in the "Argument" section of the opening brief on the motion to dismiss, they were discussed elsewhere in that brief.[127] Defendants aver these materials are "uncontroversial facts" and that "[p]laintiffs claim that the facts are subject to dispute" is not sufficient, because plaintiffs "do not offer any basis beyond their own say-so to

---

[120] D.I. 24 at 21; *see also* D.I. 34 at 3–13.
[121] D.I. 24 at 21–22 & nn.14–15.
[122] *Id.* at 28 (emphasis in original) ("Indeed, the opinion in the *Burwell* case, as well as ESRD patients' support for AKF and the fact that many of the challenges to charitable premium assistance were brought by profit-motivated insurance companies all are factors weighing ***against*** a conclusion that the Board should have known DaVita's conduct was problematic.").
[123] No. 4:17-CV-16, 2017 WL 365271 (E.D. Tex. Jan. 25, 2017).
[124] *E.g.*, D.I. 24 at 23–24 (presenting no citation to support the averment "Legally, no Court or law enforcement agency or administrative body has found that anything DaVita did was in violation of any law.").
[125] D.I. 34 at 4.
[126] D.I. 31 at 1–2 & nn.1–5.
[127] *Id.* (citing D.I. 24 at 1–2 n.1, 11 nn.5–7, 21–22 nn.14–15 ).

dispute them."[128] Plaintiffs reply that defendants do not seek to introduce these materials for their existence, rather, they contend "[d]efendants' mountain of extrinsic materials is singularly designed to dispute the truth of [p]laintiffs' well-pled factual allegations."[129]

The court agrees that these materials should be excluded from the record before the court on this motion to dismiss. First, the court has already declined to consider all arguments made outside the "Argument" sections of the briefs, including the argument related to the vast majority of the public-record materials in question.[130] The matter outside the Complaint discussed in Sections I–III of defendants' opening brief on the motion to dismiss merely accompany this already-excluded argument.[131] To be sure, these materials include extensive citation to the aforementioned *Burwell* decision.[132] Although the parties dispute the extent to which the court may take judicial notice of the *Burwell* court's Memorandum Opinion and Order,[133] the court does not reach this question. The issue presented to the court is far simpler—defendants present matter outside the Complaint as fact and ask the court to draw inferences in their favor.[134] This is improper on a motion to dismiss.[135]

Second, the remaining materials in defendants' opening brief[136] appear to

---

[128] *Id.* at 2.

[129] D.I. 32 at 1.

[130] *See supra* Part IV.A.2. at 15.

[131] *E.g.*, D.I. 24 at 1 & n.1 (attorney argument accompanied by matter outside the Complaint).

[132] *See, e.g.*, D.I. 24 at 7–9 (containing a section entitled "The Complaint Omits That A Federal Court Granted An Injunction To Prevent Implementation Of A CMS Rule So That ESRD Patients Could Continue To Receive Charitable Premium Assistance.").

[133] D.I. 30 at 13; D.I. 34 at 7–8.

[134] *E.g.*, D.I. 24 at 10–12 (identifying defendants' contentions of deficiencies in the Complaint, accompanied by inferences defendants ask the court to make in their favor).

[135] *See supra* note 56.

[136] *See* D.I. 24 at 21–22 & nn.14–15 (discussing the only public-record material in the "Argument" section).

support a legal conclusion[137] intended to demonstrate a complete lack of culpability on DaVita's part, and to lead the court to dismiss the Section 14(a) claim.[138] However this matter outside the pleadings must also be excluded. For example, the Complaint alleges that defendants violated Section 14(a) of the Securities Exchange Act of 1934 (Count IV) when they "caused the Company to purposefully steer patients into unnecessary insurance plans in order to maximize profits[.]"[139] Elsewhere, the Complaint alleges that this conduct was "unlawful[] and/or illicit[.]"[140] Defendants dispute these facts and ask the court to take notice of various Medicare regulations and publications in order to "confirm[] that DaVita's conduct was proper as a matter of law[.]"[141] Essentially, defendants ask the court to grant summary judgment as to some form of declaratory relief under the guise of "judicial notice," but no such motion is before the court. The requested judicial notice is matter beyond the Complaint,[142] which defendants ask the court to consider and to use to draw inferences in their favor.[143]

---

[137] D.I. 24 at 21 (emphasis in original) ("***Legally***, no court, government body or administrative agency has found that anything DaVita did was improper.").

[138] D.I. 34 at 3–13.

[139] D.I. 13 at ¶ 150.

[140] *Id.* at ¶ 51.

[141] D.I. 24 at 20–21.

[142] None of the public-record materials identified by defendants are discussed in the Complaint.

[143] *See supra* note 56.

### 2. Materials attached to defendants' opening brief

As to the materials attached to defendants' opening brief,[144] defendants seek to introduce these materials to argue issues of fact before the court[145] and to cite other portions of the articles for their own purposes.[146] These materials do not appear to facially contradict the allegations in the Complaint,[147] and other than defendants' general disagreement with those allegations, defendants offer no explanation as to why the court should consider these materials at this time.

### 3. Conclusion

For the reasons discussed, the court agrees with plaintiffs that the materials outside the pleadings that defendants seek to introduce are inappropriate for the court to consider at this motion to dismiss stage. The court will not consider these materials outside the pleadings and, thus, will GRANT plaintiffs' motion to strike, D.I. 28.

### C. Motion to Dismiss

Defendants "move, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1, to dismiss the Verified Consolidated Derivative Complaint, D.I. 13, on the grounds that Plaintiffs . . . failed to make demand on the DaVita Board of Directors."[148] In addressing this motion, the court considers the demand futility arguments in the Complaint, the parties arguments, the question under Delaware law of which demand-excusal test to apply, and the application of that test. For the reasons that follow, the court DENIES defendants' motion.

---

[144] D.I. 25-1, exs. A–D.
[145] *E.g.* D.I. 24 at 9–12 (disputing, in extensive detail, the allegations related to the *St. Louis Post-Dispatch* article quoted in the Complaint).
[146] *Id.* at 11 (citing D.I. 25-1, ex. B to add language from the Southern Investigative Reporting Foundation article that was not included in the Complaint).
[147] *E.g.*, D.I. 24 at 10 (attaching a corrected version of the *St. Louis Post-Dispatch* article discussed in ¶ 103 of the Complaint and disputing the interpretation of the article, but not explaining how the corrected version contradicts the allegations in the Complaint).
[148] D.I. 23.

## 1.    The parties' arguments

Plaintiffs, in the Complaint, make it clear that their position is that *Aronson* is the appropriate test for demand futility.  For example, the Complaint specifically uses the language of *Aronson* and addresses the subject of demand futility under both prongs.[149]

Meanwhile, defendants take a different approach. In the "Legal Standard" section of their opening brief in support of the motion to dismiss, defendants consider the tests for demand futility under both *Aronson* and *Rales*. Citing a decision from the Court of Chancery, *Guttman v. Huang*,[150] defendants explain that "[w]hile the tests are different, 'upon closer examination, however, that singular inquiry of *Rales* makes germane all of the concerns relevant to both the first and second prongs of *Aronson*.'"[151] Therefore, defendants argue, the standard under Delaware law is:

> whether the Board's conduct is characterized as an
> affirmative act or a failure to act, the relevant questions for
> assessing whether Plaintiffs adequately plead demand futility
> is whether the Complaint contains particularized facts
> showing that a majority of the Board lacks independence or
> is interested or faces a substantial likelihood of personal
> liability for any of the claims alleged in the Complaint.[152]

Following this logic, defendants argue that dismissal is appropriate, because:  (1) the "Complaint makes no meaningful allegations challenging the independence of the Board[,]"[153] and (2) on a claim-by-claim basis, the "factual allegations in the Complaint fall short of pleading a substantial likelihood of personal liability."[154] Starting with plaintiffs' Section 14(a) claim (Count IV), defendants contend that the court "could find that the Complaint fails to satisfy Rule 23.1 as to the Section 14(a) claims and decline to exercise supplemental jurisdiction over the state law claims."[155] What follows in

---

[149] D.I. 13 at ¶¶ 116–30.
[150] 823 A.2d 492 (Del. Ch. 2003).
[151] D.I. 24 at 13 (citing *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003)).
[152] *Id* at 13–14.
[153] D.I. 24 at 14.
[154] *Id.* at 17 (footnote omitted).
[155] *Id.* n.12.

defendants' brief is a challenge to the legal sufficiency of plaintiffs' claims under the pretense that plaintiffs have not adequately pleaded a "substantial likelihood of personal liability."[156]

Plaintiffs answer that demand is excused under *Aronson*, because "defendants' conscious decision to implement a system designed to . . . steer ESRD patients to private insurance in order to boost profits[] is not a protected business judgment."[157] "Nor are defendants protected for hiding their scheme from shareholders while they allowed it to continue."[158] In support, plaintiffs allocate nearly nine pages of their brief to discuss in detail the allegations of the Complaint and to argue that "[t]hese actions fall far outside the protection of business judgment and, therefore, demand is excused."[159] Thereafter, plaintiffs repeat their allegations that each director faces a substantial likelihood of personal liability for breach of fiduciary duty,[160] and a majority of the board also faces a substantial likelihood of liability for the Section 14(a) violation.[161] In addition, plaintiffs argue that they have adequately pleaded their state law claims.[162]

In reply, defendants contend that, with regard to the question of whether a majority of the directors lacked independence or were somehow interested, plaintiffs' response to defendants' arguments is not sufficiently "substantive" and that "[a]ccordingly, [p]laintiffs effectively concede that they have not pled a lack of independence or interestedness."[163] Defendants argue:

> Thus, by [p]laintiffs' own formulation, the survival of their Complaint rests solely on whether they have adequately alleged that [DaVita] violated the law, and are wrong to argue that the mere existence of a violation is all that

---

[156] *Id.* at 17–30.
[157] D.I. 30 at 8.
[158] *Id.* (citation omitted).
[159] *Id.* at 16.
[160] *Id.* at 17–21.
[161] *Id.* at 21–26.
[162] *Id.* at 26–30.
[163] D.I. 34 at 3–4 (footnote omitted).

> [p]laintiffs need to plead in order to allege a substantial
> likelihood of personal liability.[164]

With this straw-man argument in place, defendants contend that, under Delaware law, plaintiffs "must, first, 'point to a specific section that the company violated' and 'allege particular facts in relation to the statutes and regulations.'"[165] Of course, defendants then argue that plaintiffs *have not pleaded* any illegality.[166] Moreover, defendants identify numerous additional reasons why plaintiffs have not adequately pleaded a substantial likelihood of personal liability as to the Section 14(a) and state law claims.[167]

### 2. Analysis

Presently before the court is defendants' motion to dismiss the Complaint for failure to satisfy the demand futility requirements of Rule 23.1.[168] The parties dispute whether *Aronson* or *Rales* is the appropriate test to apply in the case at bar.[169] As a result, the record contains extensive argument related to the independence or interestedness of the directors that could apply to either *Rales* or the first prong of *Aronson*. With regard to the second prong of *Aronson*, plaintiffs address this subject in their brief, but defendants do not. Before addressing the substance of the parties' opposing positions, the court first addresses the question of which test to apply.

---

[164] *Id.* at 4.

[165] *Id.* (brackets and other alterations omitted) (citing *Wilkin ex rel. Orexigen Therapeutics, Inc. v. Narachi*, 2018 WL 1100372, at *1, *12 (Del. Ch. Feb. 28, 2018)).

[166] *Id.* at 4–13.

[167] *Id.* at 14–18.

[168] It is undisputed that Delaware law applies to the question of demand futility.

[169] *Compare* D.I. 24 at 13–14 (defendants arguing that *Rales* encompasses *Aronson* as a matter of law), *with* D.I. 30 at 7–8 (plaintiffs contending that *Aronson* applies to the case at bar).

## (a)    *Aronson* applies to the claims at bar

The allegations in the Complaint challenge specific Board decisions related to the decision to pursue the "Medicaid Opportunity" initiative,[170] to make approximately $100 million in annual donations to AKF in furtherance of the "Medicaid Opportunity" initiative,[171] to compensate executives and directors based upon DaVita's performance in the "Medicaid Opportunity" initiative,[172] and to file the 2016 Proxy Statement in furtherance of the "Medicaid Opportunity" initiative without discussing the plan and its known risks.[173] The Complaint identifies numerous reasons for demand excusal, including those associated with both prongs of *Aronson*.[174]  In their brief, plaintiffs expressly argue that *Aronson* applies.[175]

At every turn, defendants seek to direct the court's attention to the language in *Guttman* and away from any and all discussion of the business judgment prong of *Aronson*.[176] However, defendants have not adequately explained why *Rales*, and not *Aronson*, should apply to the facts alleged in the Complaint. In addition, there is no basis for the court to conclude that *Guttman* is an applicable statement of the law in the case at bar. The court discusses these reasons below.

First, defendants' conclusory assertions of a legal standard do not explain why the *Rales* test should apply to the case at bar. For example, defendants do not discuss how the allegations in the Complaint compare to the "three principal scenarios"[177] in which *Rales* applies to demand excusal.[178] Moreover, the Complaint alleges that a majority of the directors who made the challenged business decisions are still on the

---

[170] D.I. 13 at ¶¶ 49–50, 73–74; D.I. 30 at 8–10.
[171] D.I. 13 at ¶¶ 95, 109; D.I. 30 at 10.
[172] D.I. 13 at ¶ 149–56; D.I. 30 at 22–24.
[173] *E.g.,* D.I. 13 at ¶ 82; D.I. 30 at 22–26.
[174] D.I. 13 at ¶¶ 115–29.
[175] D.I. 30 at 7–8.
[176] Despite defendants' assertions, D.I. 34 at 3 n.2, the court finds no evidence that plaintiffs agreed to narrow their focus to defendants' limited *Rales* inquiry.
[177] *See supra* note 81.
[178] See generally D.I. 24.

Board and would have considered plaintiff's demand,[179] which would suggest that *Aronson* applies,[180] but defendants do not consider this threshold question.

Second, defendants' citation to *Guttman* (which follows *Rales*) as black-letter law of demand futility is misleading.[181] The cited language is part of a discussion of "the differences between the *Rales* and the *Aronson* tests *in the circumstances of this case*[.]"[182] *Guttman* is limited to its facts.

Third, on the facts, *Guttman* is inapposite. In that case, plaintiffs alleged "that the defendant-directors individually breached their fiduciary duties by either purposely trading in their individual capacities while possessing material, non-public information . . . and/or by failing to ensure that [the company] had in place the financial control systems necessary to ensure compliance with applicable accounting standards."[183] "[B]oth the plaintiffs and the defendants" in *Guttman*, "agree[d] that the standard set forth in *Rales v. Blasband* applie[d.]"[184] The Court of Chancery noted that plaintiffs did not "challenge any particular business decision made by the [company's] board as a whole."[185] In the case at bar, the Complaint does not allege insider trading or a failure of oversight. Rather, plaintiffs challenge specific Board decisions and identify *Aronson* as the applicable standard. In light of the allegations in the Complaint and the arguments in plaintiffs' answering brief, defendants offer no explanation as to why *Guttman* should apply to the case at bar.

Taking the well-pleaded allegations in the Complaint as true, and drawing all

---

[179] D.I. 13 at ¶ 120 ("Significantly, a majority (eleven out of twelve) of the current Board members . . . have served as directors during the period of time in which the illicit scheme was in full effect[.]").
[180] *Contra Rales*, 634 A.2d at 933–34 ("[A] court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit.").
[181] D.I. 24 at 13–14.
[182] *Guttman*, 823 A.2d at 500 (emphasis added).
[183] *Guttman*, 823 A.2d at 499.
[184] *See id.* (footnote omitted).
[185] *Id.*

reasonable inferences in plaintiffs' favor, the court concludes that plaintiffs have pleaded challenges to specific decisions of DaVita's Board acting as a whole. Therefore, the demand-futility test in *Aronson* applies to the case at bar.

**(b)    Under *Aronson*, the Complaint should not be dismissed**

Plaintiffs contend that the Complaint contains sufficient factual allegations to support either prong of *Aronson*.[186] Under the *Aronson* test, "if either prong is satisfied, demand is excused."[187] Thus, defendants bear the burden to establish that plaintiffs have failed to demonstrate demand excusal under *both prongs* of *Aronson*.[188]

Defendants' argument in this regard reasonably pertains to the first prong of *Aronson*—the disinterest and independence of a majority of the Board. Even defendants' extensive discussion of whether there is "a substantial likelihood of director liability" speaks to this factor as well.[189] As a result, the court begins with the second prong of *Aronson*,[190] turning to the first prong only if it is apparent that plaintiffs have not set forth particularized facts creating a reasonable doubt that the Board's decisions to pursue and support DaVita's "Medicaid Opportunity" initiative were protected by the business judgment rule.[191]  For the reasons that follow, the court concludes that plaintiffs have met their burden.

In the context of DaVita's $100 million in annual donations to the AKF, AKF's

---

[186] *See generally* D.I. 30 at 6–26.

[187] *Brehm*, 746 A.2d at 256.

[188] *Cf. Levine*, 591 A.2d 194, 206 (Del. 1991) ("[I]n a claim of demand futility, there are two alternative hurdles, either of which a derivative shareholder complainant must overcome to successfully withstand a Rule 23.1 motion.").

[189] *See, e.g.*, *Aronson*, 473 A.2d at 815 (citations omitted) ("[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.").

[190] *Aronson*, 473 A.2d at 814 ("[W]hether, under the particularized facts alleged, a reasonable doubt is created that: . . . the challenged transaction was otherwise the product of a valid exercise of business judgment.").

[191] *Brehm*, 746 A.2d at 258; *Levine*, 591 A.2d at 206.

premium assistance program, alleged AKF practices favoring dialysis patients of donor companies (such as DaVita), and known AKF policies supporting premium assistance only for dialysis (and not transplant) patients, it is reasonable to infer, as the Complaint alleges, that the Medicaid Opportunity initiative was part of a larger, systematic plan by DaVita's management to drive revenues and profitability through the AKF donations.

Defendants broadly take the position that DaVita's donations to AKF, as well as its efforts to educate dialysis patients on Medicaid and Medicare of private-insurance alternatives, were not illegal or unlawful. However, at this stage in the proceedings, the court is not concerned with the possibility, or the probability, that defendants are correct. Instead, the focus is on the facts alleged in the Complaint and the reasonable inferences, which the court must draw in favor of plaintiffs.

In this regard, the key inferences are that a reasonable stockholder could conclude that the donations to AKF were contrary to DaVita's stated policies concerning charitable donations[192] and that "[t]he Board's challenged misconduct at the heart of this case constitutes unlawful/illicit activity or the facilitation of illegal/illicit activity" approved by "a majority (eleven out of twelve) of the current Board members[.]"[193] The Complaint alleges that these types of decisions "cannot be considered a valid exercise of business judgment."[194]

In support, plaintiffs rely on several cases,[195] central among which is *Rosenbloom v. Pyott*.[196] Defendants challenge these cases on their facts, and it is apparent that some of the cited cases are limited to their facts.[197] For the most part, however,

---

[192] *See* D.I. 13 at ¶¶ 44–45 (detailing DaVita's Code of Conduct related to "Charitable Contributions" for employees, officers and directors).

[193] *Id.* at ¶ 120. The facts pleaded include numerous articles, statements by DaVita and company management, requests for public comment, and federal investigations—all of these materials support the inference that DaVita's actions were unlawful or illicit.

[194] *Id.*

[195] D.I. 30 at 8–9.

[196] 765 F.3d 1137 (9th Cir. 2014).

[197] D.I. 34 at 8–11. For example, defendants contend that *Kandell on behalf of FXCM, Inc. v. Niv*, No. CV 11812-VCG, 2017 WL 4334149, (Del. Ch. Sept. 29, 2017),

defendants' position appears to be a rebuttal solely of the allegations of illegality. For example, in *Rosenbloom*, the Ninth Circuit found that the board of directors of Allergan was consciously inactive in the face of the company's "illegal off-label promotions of Botox."[198] The *Rosenbloom* court concluded it was a reasonable inference from the facts alleged that "the 'red flags' of illegal conduct that actually or constructively alerted the Board to wrongdoing . . . were welcome indicators that a massive, Board-approved push for off-label sales of Botox was going according to plan."[199] Defendants argue that *Rosenbloom* does not apply, because "[n]o such conduct warning from counsel is alleged here."[200] In other words, defendants suggest that the law requires smoking-gun evidence of known illegal activity in the Complaint. However, "at the pleadings stage," plaintiffs do not have to "point to actual confessions of illegality by defendant directors to survive a Rule 23.1 motion[.]"[201] Instead, "a court can draw the inference of wrongful conduct when supported by particularized allegations of fact."[202] Viewing the Complaint as a whole,[203] the Board ignored several "red flags" that give rise to an inference of wrongful conduct.

---

"is the exception that proves the rule[,]" D.I. 34 at 11. This unpublished opinion of the Court of Chancery is, as defendants explain, limited to its facts, *id.* at 12, but defendants nonetheless cite *Kandell* as setting forth general principles of law, *id.*

[198] *Rosenbloom*, 765 F.3d at 1157.

[199] *Id.*

[200] D.I. 34 at 9.

[201] *Louisiana Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 357 (Del. Ch. 2012) (footnote omitted), *rev'd on other grounds sub nom. Pyott v. Louisiana Mun. Police Employees' Ret. Sys.*, 74 A.3d 612 (Del. 2013).

[202] *Id.*

[203] *Cf. Rosenbloom*, 765 F.3d at 1155 (finding the trial court abused its discretion when "it considered the factual allegations in isolation of each other rather than in combination[.]").

### (i)     DaVita's $100 million donation to AKF

There is reasonable doubt that the Board's decision to approve a $100 million annual donation and to keep the fact of this donation from stockholders is subject to the business judgment rule. It is clear to the court that a majority of defendants either knew, or should have known, that DaVita was making the $100 million annual donation to AKF. The size of this donation is remarkable, and it is reasonable to infer that DaVita expected something in return for this substantial donation. It is also remarkable that DaVita did not discuss this donation anywhere in its public disclosures, including its financial statements or its discussion of the company's charitable activities. The language in DaVita's Code of Conduct related to charitable contributions is worth repeating:

> Charitable contributions may be made to outside charities, on DaVita's behalf, with proper approvals from [DaVita's corporate communications team] in the U.S. or [DaVita's corporate compliance team] outside the U.S. We do not participate in charitable activities or make charitable contributions to improperly induce referrals, to illegally gain an unfair business advantage, or in violation of the law.[204]

Given two possibly opposing readings of the Code of Conduct, the court selects the one that favors plaintiffs.[205] A stockholder reading this Code of Conduct could reasonably conclude that DaVita did not—as a matter of policy—make donations to organizations like AKF in order to drive revenues or profit.

In addition, the members of the Board have a duty of loyalty to the shareholders,

---

[204] D.I. 13 at ¶ 44.

[205] Defendants argue that "[p]laintiffs' factual allegations do not and cannot support their contention that DaVita did anything improper – much less illegal." D.I. 24 at 3. Although this argument suggests the inference that the alleged conduct does not violate the Code of Conduct, it is improper for the court to draw such an inference in favor of defendants on a motion to dismiss. *See, e.g.*, *Rosenbloom*, 765 F.3d at 1155 (footnotes and citations omitted) (finding that "the district court committed a number of errors, and thereby abused its discretion" when it "repeatedly drew inferences in the Board's favor, crediting Allergan's reasonable interpretations of the factual allegations over Plaintiffs' reasonable interpretations of those same allegations.").

which includes the duty of good faith. Defendants' argument, that the $100 million annual AKF donation is not illegal, fails to account for the Board's duties and presumption in favor of Board oversight that gives rise to the business judgment rule in the first place. Under these well-established and known duties, a DaVita shareholder would reasonably expect the Board to disclose the AKF donation were there any possible ambiguity or uncertainty about the interpretation of the Code of Conduct. Given that defendants argue emphatically that there is nothing illegal or improper about the AKF donation, it is puzzling that the Board and company management chose not to disclose this donation to shareholders.

Moreover, the statement that the decision to make a charitable donation requires "proper approvals" from DaVita's corporate communications team, suggests that DaVita, like many other companies, would seek to publicize its charitable activities.[206] As a result, a shareholder would reasonably expect DaVita to publicize its $100 million annual donation to AKF.

Therefore, during the relevant period, the DaVita Board approved a $100 million annual donation to AKF and decided not to disclose this donation to shareholders. This was at a time in which DaVita was publicly stating that it did not make donations of that kind and was publicizing other corporate charitable activities. A reasonable shareholder would expect to know about the AKF donation either through Board disclosure or the publicity that would naturally follow a donation of such a large size. As such, these facts and the associated inferences create reasonable doubt that the Board's decision to approve DaVita's $100 million donation to AKF, and to hide this donation from shareholders, is the product of a valid exercise of business judgment.[207]

---

[206] *E.g.*, DaVita, Inc., *DaVita Reports on 2016 Corporate Social Responsibility and Innovation*, (May 22, 2017), http://pressreleases.davita.com/2017-05-22-DaVita-Reports-on-2016-Corporate-Social-Responsibility-and-Innovation.

[207] Alternatively, these decisions appear to be one of the rare cases in which "a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability [under the first prong] therefore exists." *Aronson*, 473 A.2d at 815. For the reasons discussed, the Board's

Under *Aronson*'s disjunctive test, this alone is sufficient to excuse board demand under Rule 23.1. Below, the court addresses additional bases for demand excusal.

### (ii)    DaVita's Medicaid Opportunity initiative

The facts and inferences surrounding the Medicaid Opportunity initiative support demand excusal for plaintiffs' Section 14(a) claim under the second prong of *Aronson* and plaintiffs' state law claims under the first prong of that test. A majority of defendants either knew or should have known about DaVita's Medicaid Opportunity initiative. In fact, the Board sought an advisory vote in the 2016 Proxy Statement to extend the compensation plan associated with the Medicaid Opportunity initiative to DaVita's named executive officers. Until pressured by outside forces, DaVita's Board and management chose not to publicly disclose any of these facts. When management spoke on the subject, they declined to disclose the extent of the program or its impacts on DaVita's bottom line. Broadly speaking, in light of the AKF donation, these allegations support the inference that the Board approved a plan to capitalize on DaVita's AKF donation by encouraging ESRD dialysis patients on Medicaid to apply for private insurance plans supported by AKF.

Plaintiffs' Section 14(a) claim is premised on the allegation that various disclosures were necessary to make the 2016 Proxy Statement not false or misleading.[208] Taking the well-pleaded allegations in the Complaint as true, the Section 14(a) claim supports the inference that defendants' conduct was illegal or improper.[209]

_____

decision not to disclose the AKF donation could be a breach of the defendant directors' duties of good faith and loyalty.

[208] *E.g.*, D.I. 13 at ¶ 150.

[209] D.I. 13 at ¶¶ 150–56. Defendants challenge the sufficiency of the Complaint's Section 14(a) allegations, D.I. 24 at 17–25, after stating the legal standard for a Section 14(a) claim, *id.* at 17–19, defendants' argument bears no relation to this standard and appears to be that the Section 14(a) claim should be held to a heightened pleading standard for fraud, *id.* at 19. Thereafter, defendants' subsequent arguments bear no apparent relation to either of these first two arguments, and instead appear to challenge the factual allegations in the Complaint and ask the court to draw inferences in favor of defendants, *id.* at 19–25. In light of the rambling presentation in this section, the court declines to speculate as to what defendants' argument actually is.

Such an allegation of illegal or improper conduct, therefore, creates reasonable doubt that defendants' decision to publish the 2016 Proxy Statement without these disclosures is protected by the business judgment rule.

Plaintiffs' state law claims follow a different path on these facts. Although it is unclear at this stage in the proceedings exactly how the alleged conduct is either illegal, illicit, or improper, the Board defendants should have been alerted to numerous red flags based upon the fact that DaVita did not disclose the AKF donation and pursued the Medicaid Opportunity initiative, including incentive "pay for performance" of managers and named executive officers. Chief among these is the "estimated breakeven threshold of $250 per dialysis treatment"[210] under the Medicaid Opportunity initiative, which meant that "DaVita's ability to collect over $1,000 per session generate[d] a heroic return on its capital."[211] In light of DaVita's business model, a business plan with such high margins, in and of itself, should have been a red flag for the Board. Moreover, according to the Complaint, DaVita was measuring the rate of return associated with the Medicaid Opportunity initiative in relation to charitable donations to AKF, which should have been another red flag for the Board.

Plaintiffs characterize this alleged conduct as a challenged corporate decision, but these specific allegations appear to be a failure by the Board "to act in the face of a known duty to act, [which] thereby demonstrat[es] a conscious disregard for [the Board's] responsibilities, [and is a] breach [of] their duty of loyalty by failing to discharge that fiduciary obligation in good faith."[212] A breach of the duty of loyalty gives rise to a substantial likelihood of personal liability for the majority of the Board.[213] In this regard, the Complaint alleges particularized facts that suggest a majority of the Board[214]

---

[210] D.I. 13 at ¶ 111.
[211] *Id.*
[212] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).
[213] *Id.* at 369–70.
[214] D.I. 13 at ¶¶ 124–25.

breached their duty of loyalty to DaVita shareholders under either of two theories. The first is that the Board approved the Medicaid Opportunity plan in association with the AKF donation, which plaintiffs allege was not in DaVita's best interests. The second is that the Board failed to act when company management chose to pursue this plan. Under either theory, these alleged breaches of defendants' duties of good faith create reasonable doubt that a majority of the Board is disinterested or independent and, therefore, support demand excusal under the first prong of *Aronson*.

### (iii)    Conclusion

For the reasons discussed above, plaintiffs have set forth particularized facts creating reasonable doubt that the Board decisions approving the $100 million annual donation to AKF, DaVita's Medicaid Opportunity initiative including managerial and executive compensation, and the 2016 Proxy Statement were made by disinterested and independent directors and were the product of a valid exercise of business judgment.[215] Since plaintiffs have met their burden, the court declines to address the remainder of defendants' arguments.

## V.    CONCLUSION

For the reasons discussed herein, IT IS ORDERED that:

1.    Plaintiffs' motion to strike (D.I. 28) is GRANTED, and

2.    Defendants' motion to dismiss (D.I. 23) is DENIED.

Dated:    4/25/2019                           /s/ Mary Pat Thynge
                                              Chief U.S. Magistrate Judge

---

[215] *Brehm*, 746 A.2d at 258; *Levine*, 591 A.2d at 206.